**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| EQUIPMENT LEASING GROUP OF AMERICA, LLC, and CIBM BANK | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:23-cv-16099 |
| vs. | ) ) ) | Honorable Beth W. Jantz, Magistrate Judge |
| PURE MIDSTREAM, LLC, PURE AVIATION, LLC (WY), PURE AVIATION, LLC (MT) AND PURE AVIATION AP, LLC and CARLO DOMENIC DIMARCO, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Equipment Leasing Group of America LLC ("ELGA") and CIBM Bank ("CIBM") brought suit against Defendants for an alleged breach of an Aircraft Financing Agreement (the "AFA"). Dkt. 56 at 1-2. Plaintiffs filed a Motion for Preliminary Injunction (dkt. 53) and the Court held an evidentiary hearing on July 10th, 2024, August 28th, 2024, and September 4th, 2024. This Memorandum Opinion and Order will serve as and constitute the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52.

For the reasons that follow, Plaintiffs' Motion for Preliminary Injunction (dkt. 53) is DENIED. Plaintiffs' Motion (dkt. 149) to exclude part of Peter Hickey's expert testimony is DENIED. Defendants' Motion (dkt. 149) to exclude part of Gary Trebels' expert testimony is DENIED.

The following Motions remain pending at this time: Plaintiffs' Motion to Dismiss (dkt. 74); Defendants' Amended Motion for Judgment on the Pleadings or in the Alternative for Default Judgment (dkt. 76); Plaintiffs' Motion to Strike and for Sanctions (dkt. 80); and Plaintiffs' Motion

1

to Enforce and for Sanctions (dkt. 139), which is pending in part. Given the change in defense counsel over time, Defendants should come prepared to the next status hearing to address whether they will be standing by their pending motion (dkt. 76) or whether they plan to withdraw it as premature.

A status hearing is set for 10/31/24 at 11:15 a.m. The Parties should also come prepared with a joint proposed discovery plan to move the case forward and to update the Court on any renewed interest in settlement, both of which the Parties should discuss between themselves ahead of the status hearing.

## **BACKGROUND**

On or around December 31st, 2022, Plaintiff ELGA and Defendant Pure Midstream, LLC ("Pure Midstream") entered into the AFA to enable Pure Midstream to purchase a Hawker/Beechcraft plane, Serial No. RC047 (the "Aircraft"). Pls.' Ex. 1. Guaranties also were issued by the other four Defendants: Pure Aviation, LLC (WY); Pure Aviation, LLC (MT); Pure Aviation AP, LLC; and the managing member of Pure Midstream, Carlo DiMarco ("DiMarco"). Pls.' Exs. 3a, 3b, 3c, 3d. ELGA paid out $2.4 million to Pure Midstream per the AFA. Dkt. 53 at 5; DiMarco Hr'g Test., Sept. 4, 2024. ELGA later sold its rights under the AFA to Plaintiff CIBM Bank. Dkt. 56, ¶ 20. On November 17th, 2023, ELGA filed the Complaint (dkt. 1) in this suit, alleging several defaults under the AFA. CIBM bank later joined the suit and together Plaintiffs seek to recover more than $3.7 million. Dkt. 56. Five months after the initial Complaint (dkt. 1) was filed, on April 2nd, 2024, Plaintiffs filed the instant Motion for Preliminary Injunction (dkt. 53), asking the Court to enjoin Pure Midstream from moving the Aircraft, for immediate access to the Aircraft, and for immediate possession of the Aircraft to prepare it for sale, *id.* at 1, and later

also requesting as relief the ability to actually "sell or lease the Aircraft as a means of recovering the amount owed to them," dkt. 108 at 2.

Per the AFA, Pure Midstream was required to pay monthly amounts to ELGA. Pls.' Ex. 1. The AFA allowed Pure Midstream to "prepay the Indebtedness." *Id.* It also gave ELGA a first priority security interest in the Aircraft, required Pure Midstream to maintain the Aircraft, required Pure Midstream to provide ELGA with certain financial information, and set forth various remedies in the event of default, including the right to repossess the Aircraft. *Id.*

In March of 2023, the Parties entered into a First Amendment to the AFA which adjusted the monthly payments due. Defs.' Ex. 35. The First Amendment was sent to DiMarco with an amortization schedule that listed out the monthly "payment" amounts, as well as the monthly "interest" and "principal" amounts, which together added up to the monthly "payment" amounts. Pls.' Ex. 17.

Pure Midstream made all of its payments on time until August of 2023. G. Trebels Hr'g Test., Aug. 28, 2024. Days before the August 1st, 2023 payment was due, DiMarco texted Rudy Trebels, a co-owner of ELGA, asking that the payment be postponed and indicating that he was going through a refinance. Defs.' Ex. 41. There was no response by text, but DiMarco testified that he spoke to Rudy Trebels on the phone and told him that he was going through a refinancing and that he wanted a payoff of the AFA with ELGA. DiMarco Hr'g Test., Sept. 4, 2024. On August 29th, an email request for payoff was sent to ELGA by Defendants' Controller. Pls.' Ex. 26. By September 1st, neither the August nor the September payments had been made. B. Trebels Hr'g Test., July 10, 2024.

On September 5th, DiMarco texted Brian Trebels, "Could you confirm we have asked for a payoff statement twice. We are closing by the 10th on it[.]" Pls.' Ex. 36. That same day, Brian

Trebels sent a letter to DiMarco stating that the payoff amount was $3,360,076.00 and referring to the AFA as a "lease." B. Trebels Hr'g Test., July 10, 2024. After receiving the letter, DiMarco sent an email to ELGA attaching the amortization schedule and suggesting that the payoff amount was incorrect. Defs.' Ex. 45. He also texted Rudy Trebels, "On this deal. I'm being told we are in a lease. This was a purchase with a balloon…I'm also being told my payoff is over $1.3m higher than actual [sic] of the deal? It's only been 7 mos how could this be?" Defs.' Ex. 41. Rudy Trebels responded, "Let me check and will get back to you. It is not a lease but a finance agreement – but not made to be paid off early." *Id.*

The next day, on September 6th, Brian Trebels sent a second letter to DiMarco stating that the total payoff amount was $3,470,604 and that the AFA was in default. Pls.' Ex. 7. DiMarco texted Brian Trebels, "There is a mistake on the payoff. When is a good time to review?" Pls.' Ex. 36. Brian Trebels responded that the August and September payments bounced and another late fee, along with bounce fees, were incurred. *Id.* He stated that he would look at payoff once monthly payment was received, as payoff amount was a "moving target with the bounces." *Id.* DiMarco explained he needed a "payoff number to close," and that it needed to follow the amortization schedule, while Brian Trebels stated that he "thought it was a full payout." *Id.*  On September 7th, DiMarco sent an email to Brian Trebels which in part stated, "We have payments missing and it doesn't comport to the [l]oan amortization that [ELGA] provided during and after for the amended deal after signing. Let's review…" Defs.' Ex. 45.

To put it simply, the Parties disagreed about how a prepayment payoff would be calculated. ELGA apparently believed, based on the terms of the AFA, that prepayment would require Pure Midstream to pay all of the remaining monthly payments in full at the time of prepayment, which included paying both the principal and interest for each month. Pure Midstream and DiMarco

apparently believed that prepayment required it to pay only the principal amount of the remaining payments, as that would be the point of paying off a financing or loan agreement early. While this disagreement (and Defendants' arguments about anticipatory repudiation) may need to be resolved at some point down the road, it is unnecessary for the Court to do so now, as the preliminary injunction is being denied on other grounds, as explained below.

On September 21st, ELGA, through counsel, sent Pure Midstream a letter stating that it was in default and that it would accelerate all amounts due if the account was not made current within ten days. Defs.' Ex. 49. On September 27th, the August payment was made. B. Trebels Hr'g Test., July 10, 2024. On September 29th, an ELGA representative told DiMarco by email that the amount to bring his account current was $60,470.80, which included the September payment, plus late fees and bounce fees from both August and September. Defs.' Ex. 45. It is unclear when exactly, but this amount was paid prior to the end of 2023. B. Trebels Hr'g Test., July 10, 2023; DiMarco Hr'g Test., Sept. 4, 2024. Indeed, Pure Midstream made all payments through the end of 2023, even though not all of them were timely made. G. Trebels Hr'g Test., Aug. 24, 2024.

ELGA stopped sending invoices to Pure Midstream in January of 2024, and Pure Midstream stopped making payments at that time. B. Trebels Hr'g Test., July 10, 2024; DiMarco Hr'g Test., Sept. 4, 2024. DiMarco testified that he withheld payments because he believed the Parties were making progress towards settlement from January to April of 2024. *Id.* Indeed, at the end of January, the Parties reported to the Court that settlement discussions were taking place, dkt. 31, requested a settlement conference in February, dkt. 38, and were working with the Court on settlement through mid-March, dkt. 47, all according to the docket in this case.

As noted above, on April 2nd, 2024, five months after the initial Complaint (dkt. 1) in this case was filed, Plaintiffs filed their Motion for Preliminary Injunction (dkt. 53), asking the Court to enjoin Pure Midstream from moving the Aircraft, for immediate access to the Aircraft, for immediate possession of the Aircraft to prepare it for sale, *id.* at 1, and later also requesting as relief the ability to "sell or lease the Aircraft as a means of recovering the amount owed to them," dkt. 108 at 2. Defendants' Response (dkt. 64), filed on April 23rd, included a Declaration from DiMarco (dkt. 66), in which DiMarco declared, "[D]espite Pure Midstream's reasonable and justified concerns, and not having received an invoice from ELGA since December, Pure Midstream has recently issued a payment of $221,359.60 to ELGA for past invoices during this time…I think it is also worth mentioning that in the past, we have been invoiced with incorrect due dates or amounts under the Agreement. Despite all of these issues, we are still open and willing to payoff this loan, so long as the amount is fair and reasonable." Dkt. 66, ¶ 27; dkt. 66-8.

DiMarco attached a document dated April 23rd, that states, "You have successfully initiated a wire sent to [Silicon Valley Bank] for processing," and indicates that the "[n]umber of approvals required before sending" was one. Dkt. 66-8. The "Transaction Amount" on the document is listed as $221,359.60, the "Beneficiary Name" is listed as ELGA, and the "Beneficiary Bank" is listed as CIBM. *Id.*

On May 7th, Plaintiffs filed a Reply (dkt. 71) to their Motion (dkt. 53). On May 13th, Defendants filed a Sur-Reply (dkt. 73-1). On May 24th, Plaintiffs filed a Motion (dkt. 80) to strike portions of DiMarco's declaration and for sanctions[1] and stated that they had not received the wire

---

[1] This Motion (dkt. 80) remains pending following the evidentiary hearing and will be ruled upon at a later date if the case does not resolve before then. A ruling is not necessary at this point because even if the Court later grants the Motion (dkt. 80) and strikes the declaration, the preliminary injunction analysis would remain unchanged as to Defendants' solvency (which, as addressed later in this Order, is central to the Court's ruling).

transfer. *Id.* At a June 4th status hearing, Plaintiffs made an oral motion for an evidentiary hearing, which was granted, for both this Motion (dkt. 80) as well as Plaintiffs' Motion for Preliminary Injunction (dkt. 53) and set for June 24th based in part on the parties' availability. Dkt. 82. On June 13th, Defendants filed a Response (dkt. 84) to the Motion to Strike (dkt. 80), and DiMarco declared in another declaration (also dated June 13th) that, "there was an issue with the wire and it did not go through to ELGA," but that Defendants "expect to have this rectified shortly, after which the wire will be re-sent to ELGA along with June's payment." Dkt. 84-1, ¶¶ 1, 3.

The same day Defendants' Response (dkt. 84) was filed, Defense counsel withdrew. Dkt. 85. The Court continued the evidentiary hearing to July 2nd to allow Defendants to obtain new counsel, dkt. 86, to July 8th after new Defense counsel filed appearances, dkt. 97, and then to July 10th, at the request of new Defense counsel, because it was a two-day extension and would therefore not prejudice Plaintiffs, dkt. 100. DiMarco testified that he received advice from this new counsel that was contrary to the advice he received from his initial counsel, and at that time changed his mind about re-wiring the $221,359.60 payment. DiMarco Hr'g Test., Sept. 4, 2024.

Ahead of the evidentiary hearing, and given these developments in the case, the Court allowed the parties to file additional briefing: Defendants filed a position statement, dkt. 103, on the contested issues going into the hearing, and Plaintiffs did the same, dkt. 105.

The evidentiary hearing went forward on July 10th. Dkt. 115. Plaintiffs called Brian Trebels as their first witness, whose testimony took up most of the day. B. Trebels Test., July 10, 2024. At the end of the day, Plaintiffs called Gary Trebels to testify. G. Trebels, Hr'g Test., July 10, 2024. Defendants objected to Gary Trebels' testimony, to the extent that he would be testifying about Defendants' financial statements and what they mean, on the basis that it would be undisclosed expert testimony. *Id.* The Court agreed with Defendants that it might be expert

testimony but gave Plaintiffs a chance to properly disclose Gary Trebels as an expert if they wanted him to testify as such. *Id.* The evidentiary hearing was continued to July 29th, which Plaintiffs agreed to in part because Defendants agreed not to move the Aircraft until the continued hearing. Hr'g Test., July 10, 2024; dkt. 115.

Plaintiffs subsequently disclosed Gary Trebels and Defendants objected to the disclosure. Dkt. 116. The Court found that Gary Trebels' anticipated testimony would be expert testimony in part because Plaintiffs made no showing that he had any "personal knowledge about ***Defendants'*** finances." Dkt. 121. But the Court also ruled that the disclosure was insufficient as it stood because more was required than just the anticipated "subject matter" of his testimony; Plaintiffs must also disclose at a minimum "a summary of the facts and opinions to which the witness is expected to testify." *Id.*; Fed. R. Civ. P. 26(a)(2); *see also* Fed. R. Evid. 702. The Court gave Plaintiffs another chance to sufficiently disclose Gary Trebels' expert testimony but noted that doing so would require a continuance of the evidentiary hearing, given it was only days away at that point. *Id.* Plaintiffs requested the continuance, and the evidentiary hearing was continued to August 9th. Dkt. 123; dkt. 124.

On August 1st, Defense counsel again withdrew, dkt. 125, and on August 7th, new Defense counsel appeared, dkt. 129. The Court held a status hearing on August 8th, and granted Defendants' request to continue the hearing, given that counsel represented that they could not fulfill their ethical duties if the hearing went forward the next day, and given that Defendants again agreed to keep the Aircraft grounded through the next hearing date and to make an immediate

request that the FlightAware[2] tracker be turned on. Dkt. 138. The evidentiary hearing was continued to August 28th on these grounds. *Id.*

On August 14th, Plaintiffs filed a Motion (dkt. 139) to enforce the Court's Order (dkt. 138) and for sanctions, asserting that FlightAware had not been turned on. The Court held a hearing on the Motion (dkt. 139) and denied it in part, as Plaintiffs had been given access to the FlightAware tracker. Dkt. 145. The Motion (dkt. 139) remains pending as to the sanctions aspect, and the Court will rule on it at a later date if necessary.

On August 28th, the evidentiary hearing resumed. Dkt. 149. Plaintiffs called Gary Trebels as an expert witness and Defendants called Peter Hickey as a rebuttal expert witness. Hr'g Test., Aug 28, 2024. At the end of the day, Plaintiffs called Defendant DiMarco as their final witness. *Id.* The evidentiary hearing was continued to a third and final day on September 4th, dkt. 149, dkt. 158, during which DiMarco continued his testimony and was examined by both sides, Plaintiffs recalled Brian Trebels as a rebuttal witness, and the Parties both presented oral arguments. Hr'g Test., Sept. 4, 2024. The witnesses' testimony is summarized in relevant part throughout this Order.

## DISCUSSION

### I. Preliminary Injunction Standard

"Determination of whether a movant is entitled to a preliminary injunction involves a multi-step inquiry." *Intl' Assoc. of Firefighters, Local 365 v. City of East Chicago*, 56 F.4th 437, 446 (7th Cir. 2022). First, a party seeking a preliminary injunction must show that (1) it has some likelihood of success on the merits of its claim, and (2) that it has no adequate remedy at law and

---

[2] "FlightAware provides accurate real-time, historical and predictive flight insights to all segments of the aviation industry." FlightAware, https://www.flightaware.com/ (last visited Oct. 7, 2024).

will suffer irreparable harm without injunctive relief. *Id.* If the movant satisfies these threshold elements, the Court must weigh the harm to the moving party if the injunction is denied against the harm to the nonmoving party and the public if it is granted. *Id.* "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted ***unless the movant, by a clear showing, carries the burden of persuasion***." *Goodman v. Ill. Dep't of Fin & Pro. Regul.*, 430 F.3d 432, 437 (7th Cir. 2005) (emphasis added).[3]

## II.     Irreparable Harm and Adequate Remedy at Law[4]

As will be explained below, Plaintiffs have not met their burden to show that they will have no adequate remedy at law and will suffer irreparable harm without injunctive relief. Because Plaintiffs have not met this threshold requirement for a preliminary injunction, the Court need not address the other requirements, such as likelihood of success. *See, e.g., Intl' Assoc. of*

---

[3] As the Court noted during the evidentiary hearing, the evidentiary standards are relaxed at the preliminary injunction stage. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); *see also Dexia Credit Loc. v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010) ("And even if Dexia's evidence was inadmissible under the Federal Rules of Evidence, we have recognized that a district court may grant a preliminary injunction based on less formal procedures and on less extensive evidence than a trial on the merits."); *Dumanian v. Schwartz*, No. 19 C 6771, 2022 WL 2714994, at *1 (N.D. Ill. July 13, 2022) ("Furthermore, in considering a motion for a preliminary injunction, the Court may consider evidence that may be inadmissible at trial, such as hearsay, to the extent that it finds that evidence reliable.")

[4] The elements of irreparable harm and adequate remedy at law are closely related and the Court will analyze them together. *See, e.g.*, *In re First Farmers Fin. Litig.*, No. 14-CV-7581, 2017 WL 3478813, at *10 (N.D. Ill. Aug. 14, 2017) (addressing irreparable harm and adequate remedy at law together); *see also Intl' Assoc. of Firefighters*, 56 F.4th at 446 (stating that irreparable harm and adequate remedy at law are part of the same requirement for injunctive relief); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) ("Where the only remedy sought at trial is damages, the two requirements—irreparable harm, and no adequate remedy at law—merge").

*Firefighters*, 56 F.4th at 446 ("As a ***threshold*** matter, a party seeking a preliminary injunction must demonstrate…that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied.") (internal quotation marks and citation omitted) (emphasis added).

"Harm is irreparable if legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). The legal remedies available to the moving party must be "seriously deficient as compared to the harm suffered." *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022). Where a monetary award can make the moving party whole at the end of a lawsuit, there can be no irreparable harm. *D.U. v. Rhoades*, 825 F.3d 331, 339 (7th Cir. 2016) ("Because money damages could make [the moving party] whole again should she prevail in her lawsuit, she does not meet the standard for irreparable harm."). Additionally, the moving party must show that irreparable harm is likely – not just possible – in the absence of injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22-24 (2008). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

In this case, a monetary award would make Plaintiffs whole at the end of the litigation. This is essentially a breach of contract case, based on Defendants' alleged failure to make payments and other defaults under the AFA, and Plaintiffs' ultimate goal is to recoup their alleged monetary loss. The injunctive relief sought is merely a means to ensure that this is possible. *See, e.g.,* dkt. 53 at 7 ("ELGA will suffer irreparable harm if defendants deny ELGA's right to inspect the Airplane, repossess the Airplane and prepare for its sale or lease ***as a means of obtaining payment*** on the secured loan.") (emphasis added). Plaintiffs have made no showing that their injury is anything other than financial. As long as Plaintiffs' alleged injury is "purely

economic and [can be] compensable in money," there is no irreparable harm. *Meek v. Archibald & Meek, Inc.*, No. 21-CV-02397, 2021 WL 2036535, at *4 (N.D. Ill. May 21, 2021); *see also Holy Hops, Inc. v. Beer Church Hosp. Grp., Inc.*, No. 19 C 7180, 2019 WL 11626481, at *3 (N.D. Ill. Dec. 11, 2019) (finding no irreparable harm where the moving party "has not even attempted to show that its potential losses are anything other than financial.").

Still, Plaintiffs argue that they "will not have any legal remedy (money damages) if [their] equitable remedies are not enforced so as to preserve the collateral." Dkt. 53 at 9. Plaintiffs included no authority in their Motion (dkt. 53) to support this argument nor did they include any examples of similar cases in which a preliminary injunction was granted under these circumstances (they cited one case during oral argument that is addressed later in this opinion). "As a general rule, a defendant's ability to compensate plaintiff in money damages precludes issuance of a preliminary injunction." *Signode Corp. v. Weld–Loc Systems*, Inc., 700 F.2d 1108, 1111 (7th Cir.1983) (internal quotations omitted).

Nonetheless, it is true that money damages may be inadequate where a defendant "may become insolvent before a final judgment can be entered and collected," *Roland*, 749 at 386, which is essentially why Plaintiffs seek through a preliminary injunction to repossess, preserve, and/or ultimately sell the collateral behind this AFA, the Aircraft. The Seventh Circuit has not specifically addressed what is required to show insolvency, and there are no clear guidelines used universally by courts as far as this Court could tell. What is clear from the caselaw is that Plaintiffs must make more than a speculative argument to carry their burden. *See, e.g.*, *Meek*, 2021 WL 2036535, at *4 ("[The plaintiff]'s fear regarding [the defendant]'s filing for bankruptcy is speculative only, and speculative harm cannot be the basis for irreparable harm.").

12

To this end, in advance of the evidentiary hearing, the Court specifically asked the Parties to present evidence about the "solvency of all Defendants and Guarantors." Dkt. 82. As will be explained below, Plaintiffs did not provide sufficient evidence of Defendants' purported insolvency, and therefore did not carry their burden that they will have no adequate remedy at law without injunctive relief.

Among other witnesses, Plaintiffs called Gary Trebels— a current employee of ELGA as its Senior Vice President of Credit and Syndication, and a relative of the owners— as an expert witness to testify to Defendants' financial state.[5] G. Trebels Hr'g Test., Aug. 28, 2024. Gary Trebels has a degree in finance and is a "Certified Lease Professional." *Id.* Defendants called as an expert witness Peter Hickey ("Hickey") – an economic consultant at Pergerine Economics, a company he co-founded.[6] Hickey Hr'g Test., Aug. 28, 2024. Hickey has a degree in economics, as well as an MBA. *Id.* He holds himself out as an expert on financial statement analysis, business valuation, economic damages, security and commodities trading, and has testified

---

[5] On the night before the second day of the evidentiary hearing, Plaintiffs' counsel supplemented their disclosure of Gary Trebels with an additional opinion regarding the impact of certain entries in Defendants' financial statements. Dkt. 153 at 36-40. Defense counsel objected to the supplemental disclosure as untimely. Hr'g Test., Aug. 28, 2024. Given that Plaintiffs' Motion (dkt. 53) is being denied, the point is moot, and Defendants' oral motion to exclude this opinion is therefore denied as moot.

[6] Defendants disclosed Hickey as a rebuttal expert witness on August 16, 2024. Dkt. 144. On August 21, 2024, Plaintiffs' counsel emailed Defense counsel raising concerns that Hickey had the opportunity to review documents that were never produced to Plaintiffs and requesting that those documents be produced. Dkt. 151. The next day (six days before the next evidentiary hearing date), Defendants supplemented their disclosure with the documents reviewed by Hickey, at least some of which had previously been in Plaintiffs' possession. *Id.* At the hearing, Plaintiffs' counsel objected to the disclosure as untimely. Hr'g Test., Aug. 28, 2024. Plaintiffs' timeliness objection is overruled, as the documents were provided in direct response to counsel's request and because Plaintiffs' counsel and their witness had six days to review the documents ahead of the next hearing date, which is not unreasonable in light of the expedited nature of preliminary injunction hearings. Plaintiff's oral motion to exclude is therefore denied.

and/or provided expert reports in all of those areas of expertise. *Id.* Specifically, he has provided opinions in the past as to the solvency of companies. *Id.*

Prior to the hearing, both witnesses reviewed consolidated financial statements of the four corporate entities for 2023 (Pls.' Ex. 27) and for the first five months of 2024 (through May) (Pls.' Ex. 28). G. Trebels & Hickey Hr'g Test., Aug. 28, 2024. The financial statements included a balance sheet, profit and loss statement, and a cash flow statement. Pls.' Exs. 27, 28. Attached to the 2023 statement was an "Independent Accountant's Review Report" (the "Report") of Pure Aviation, LLC (MT)'s finances for 2022 and 2023, dated April 3rd, 2024. Pls.' Ex. 27 at 34-48. The witnesses both presented testimony based upon these financial statements. But as the Court will explain, Plaintiffs' witness did not persuade the Court that Defendants are or will become insolvent, while Defendants' witness provided compelling testimony that Defendants are solvent.

Gary Trebels' testimony focused on Defendants' cash flow and liquidity in the operation of its business as a reflection of whether they could pay their debts on a timely basis. G. Trebels Test., Aug. 28, 2024. He opined that Defendants did not have sufficient cash to conduct their business and he based that opinion on such observations as "confusing" cash figures in the financial statements, the fact that the "report for 2024 for the five months total sales or income coming in is…down a huge amount…from [20]23 for the whole year," and the fact that in 2024, Defendants owed money to Plaintiffs. *Id.* He further testified that when a company's current liabilities exceed its current assets, it means there is a "negative working capital," and that per the 2024 financial statement, Defendants' "Total Current Liabilities" exceed its "Total Current Assets," which he defined as excluding from consideration longer term assets such as property and equipment. G. Trebels Hr'g Test., Aug. 28, 2024; Pls.' Ex. 28 at 2, 4.

Notably, Mr. Trebels testified on a point that squarely cuts against a finding of Defendants' purported insolvency. On cross examination, Defense counsel asked whether he was telling the Court that Defendants were insolvent and that they could not pay Plaintiffs. G. Trebels Hr'g Test., Aug. 28, 2024. Mr. Trebels tellingly responded, "I'm not saying they cannot pay us. They chose not to pay us." *Id*. Those are two very different things, and the latter does not support a finding of insolvency, which the Plaintiffs must prove in order to be entitled to a preliminary injunction under the circumstances here.

Defendants' expert, Hickey, on the other hand, specifically explained that one of the tests for solvency is the "balance sheet test," where if the "fair market of the assets exceed the liability, that company is determined to be balance sheet solvent." Hickey Hr'g Test., Aug. 28, 2024. Hickey opined that Defendants were solvent under this test as of December 2023 and as of May 2024, based on his analysis, which involved comparing Defendants' "Total Assets" to "Total Liabilities." *Id.* Hickey also testified that according to the balance sheet test, the financial statements did not show that Defendants' solvency had diminished over time. *Id.* He went even further and opined that Defendants' performance looked promising as of May 2024, because they continued to grow revenue, earn money, and were able to get credit from a variety of parties, who deemed them credit worthy. *Id.* Hickey acknowledged that if Defendants' revenue was analyzed through only the first five months of 2024, the amount of their revenue would be in decline. *Id.* However, he stated that he could not make that determination, especially about an oil and gas company, without knowing and comparing the revenue for the first five months of 2023. *Id.* Hickey also testified that he had no concerns based on the potential decline in revenue because if you compare the operating income from December 2023 and May 2024, and assume that Defendants operated as *profitably* over the remainder of 2024 as they did during the first five

15

months, the operating profit for the company would go up significantly, which would be more relevant for creditors than any decline in just revenue. *Id.*

Given the in-court testimony of both expert witnesses, the Court finds Hickey's testimony as a whole to be reliable evidence that cuts against Plaintiffs' arguments about Defendants' purported insolvency, given his qualifications, use of a particular test of solvency, and thorough explanations of his analysis. By contrast, Gary Trebels' testimony was not sufficient to explain and prove how Defendants are or would be insolvent, particularly in light of Defendants' other assets, accounts receivable, and lines of credit, and his admission about the distinction between ability to pay and choice to pay.

In addition to presentation of testimony from Gary Trebels, Plaintiffs raised several other points through testimony and argument that they posited go to show Defendants' insolvency, each of which will be addressed below. First, throughout Gary Trebels' testimony (and throughout Plaintiffs' arguments in general), Plaintiffs raised concerns with certain amounts listed on the financial statements, suggesting that the statements were unreliable because they were produced by Defendants themselves. *See, e.g.*, G. Trebels Hr'g Test., Aug. 28, 2024. However, Plaintiffs did not present any compelling evidence that the financial statements were unreliable. Additionally, the Court notes that some of the expert testimony was related to the attached Report for 2023, which was done by an ***independent*** accountant. Pls.' Ex. 27 at 34-48. To the extent that Plaintiffs argue now that they needed more financial documents or additional financial information in order to assess Defendants' insolvency, this issue was not raised via motion in advance of the evidentiary hearing or at the evidentiary hearing.[7]

---

[7] Ahead of the evidentiary hearing, Plaintiffs indicated that they were still seeking additional financial information from Defendants, and following up on previous meet and confers that the Parties had had on this subject, the Court ordered the Parties to discuss "what financial

16

Plaintiffs also pointed to Defendants' relationship with another lender, SouthStar Financial, LLC ("SouthStar"), Pls.' Ex. 45, which was discussed in the Report, Pls.' Ex. 27 at 46. The Report states that Pure Aviation, LLC (MT):

> "entered into a $20M factoring agreement with SouthStar Financial, LLC in March 2021 [which was] secured by a blanket lien on effectively all assets of the LLC in addition to the assets of related parties Pure Aviation LLC (Wyoming) and Pure Midstream LLC. In 2023, SouthStar notified the LLC that they would not be able to extend the total amount originally agreed upon and that the LLC had drawn the maximum amount that SouthStar could advance. In November 2022, the LLC entered into a $40M factoring agreement with RTS Financial Services, Inc. secured by all assets of Pure Aviation, LLC. As of December 31, 2023 and 2022, amounts owed to SouthStar Financial, LLC were $7,354,277 and $2,119,328, respectively and no amounts had been advanced under the agreement with RTS Financial Services. Amounts drawn related to factoring agreements are reported in the current debt line of the balance sheet." Pls.' Ex. 27 at 46.

This is certainly evidence that Defendants owed money to SouthStar, but it is not persuasive evidence of Defendants' insolvency. The money owed to SouthStar was included in the financial statements reviewed by Hickey, and he still determined that Defendants were balance sheet solvent. Hickey Hr'g Test., Aug. 28, 2024. Further, Defense counsel argued that according to the financial statements, as of May 2024, Defendants no longer owed anything to SouthStar. Hr'g Test., Sept. 4, 2024. The Court is unconvinced that the Report necessarily indicates that Defendants did not qualify for access to any more cash under their factoring agreements. Defendants' factoring agreements do not suggest that Defendants cannot pay;

---

documents are reasonably (not exhaustively, as preliminary injunction proceedings are by necessity truncated, *see Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("given the haste that is often necessary…a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits), necessary to prove or disprove the financial solvency of Defendants and Guarantors." Dkt. 102 at 2. The Court further ordered Defendants to produce any such financial information ahead of the evidentiary hearing. *Id.* At the start of the first day of the evidentiary hearing, Plaintiffs represented that they had received additional financial information ahead of the hearing, that they were ready to move forward with the actual hearing and made no assertion that they required additional financial information at that time. Hr'g Test., July 10, 2024, (dkt. 122), Tr. at 1-8.

indeed, as Hickey testified, they are evidence that other companies deemed them credit-worthy. *See* Hickey Hr'g Test., Aug. 28, 2024 ("[W]hen you see a company that has a $20 million factoring agreement and then it is extended a $40 million factoring agreement, that's telling me that someone, some company who extended that agreement to the company was satisfied that they were credit worthy.").

Plaintiffs also presented evidence that in August of 2017, DiMarco filed for bankruptcy and a lender objected to his discharge. DiMarco Hr'g Test., Sept. 4, 2024; Pls.' Ex. 46. An "Agreed Final Judgment" was entered against DiMarco, dated December 22, 2017, which included factual findings that were the "subject of a settlement agreement." Pls.' Ex. 46 at 7. Those factual findings included that DiMarco obtained the lenders' entry into the loan "by false pretenses, false representations, and actual fraud," and "by use of at least one statement in writing…that was materially false...respecting the DiMarco Entities, DiMarco's, or an insider's financial condition." *Id.* at 5-6. A judgment was entered against DiMarco for almost $7 million. *Id.* at 7-8.

This judgment, however, does not support a finding that Defendants may be insolvent. The judgment is from over six years ago, and DiMarco testified that it was disclosed to Rudy Trebels before ELGA itself decided to enter into the AFA with Defendants including DiMarco. DiMarco Hr'g Test., Sept. 4, 2024. And importantly, DiMarco also testified that the judgment was paid in full in 2022 from the proceeds and profits of his companies, the corporate Defendants in this case. *Id.* If anything, this evidence indicates that Defendants would be able to pay a monetary award at the end of this litigation, as DiMarco did so before, for an amount even larger than the amount in controversy here. *Cf. Snyder v. Ocwen Loan Servicing, LLC*, 258 F. Supp. 3d 893, 913 (N.D. Ill. 2017) (finding an award of money damages would be inadequate

18

where the defendant "stated that it 'has never had the ability to pay even a small fraction' of the amount of statutory damages that would be awarded.").

Throughout the hearing, Plaintiffs also emphasized that Defendants made late payments beginning in August of 2023 and stopped making payments at the beginning of 2024. But Plaintiffs did not establish that late and missed payments necessarily show insolvency here; Plaintiffs did not establish that the late and missed payments were necessarily a result of Defendants' financial state, particularly given Gary Trebels' testimony that Defendants *chose* not to pay, rather than that they were unable to pay. G. Trebels Hr'g Test., Aug. 28, 2024. Based on the evidence before the Court, there seems to be other possible explanations for the cessation of payments, aside from Defendants being unable to pay. First, regarding the late payments, at the same time that Pure Midstream began making late payments to ELGA in late 2023, DiMarco was communicating with ELGA asking for a payoff. DiMarco Hr'g Test., Sept. 4, 2024; Pls.' Ex. 26. The communications between Rudy and Brian Trebels and DiMarco make it clear that the parties came to realize that they were not in agreement about how a payoff should be calculated and what amount would be due. Pls.' Exs. 7, 36; Defs.' Exs. 41, 45. But importantly, all the 2023 payments *were* made. G. Trebels Hr'g Test., Aug. 28, 2024.

Second, regarding the cessation of payments in 2024, DiMarco testified that he stopped making payments in January of 2024 because the Parties were working on settlement following Plaintiffs' filing of suit in November 2023, and he believed those discussions were progressing until April of 2024. DiMarco Hr'g Test., Sept. 4, 2024. This testimony is supported by the timeline of events: ELGA stopped sending invoices to Pure Midstream in January, B. Trebels Hr'g Test., July 10, 2024; the Parties were working on settlement with the Court through March, dkt. 47; and the Motion for Preliminary Injunction (dkt. 53) was then filed in early April, when settlement talks

presumably broke down in Plaintiffs' view. DiMarco testified that he later withheld further payments (including the wire transfer at issue in the Motion to Strike (dkt. 80)) because of advice from Defendants' second counsel who filed appearances in June of 2024, dkt. 97. DiMarco Hr'g Test., Sept. 4, 2024. Ultimately, Plaintiffs did not present sufficient evidence that the late and missing payments were a result of Defendants' inability to pay.

During oral argument, Plaintiffs drew the Court's attention to *Gen. Elec. Cap. Corp. v. All. Transportation Grp. LLC*, No. 09 C 734, 2009 WL 10702069, (N.D. Ill. Feb. 13, 2009), a case in which the court issued a temporary restraining order enjoining and restraining the defendant from using the collateral and ordering the defendant to disclose the location of the collateral (but also declining the plaintiff's request to gain actual possession of the collateral, because plaintiff failed to make a showing of irreparable harm should it not be given immediate possession). *Id.*, at *4-5; Hr'g Test., Sept. 4, 2024. The plaintiff's arguments in that case were similar to here. *Compare Gen. Elec.*, 2009 WL 10702069, at *3 (where the defendant had missed three monthly payments and the court stated, "[p]laintiff contends that the Collateral is mobile and therefore could be moved beyond the Court's jurisdiction. Plaintiff further contends that with the passage of time, and use by the Defendants, the Collateral will depreciate in value."), *with* this case at dkt. 53 at 7 ("Airplanes are obviously highly mobile. Defendants can quickly move the Aircraft from its current hangered location to another location, including a foreign location… If the Court denies injunctive relief, the value of the Aircraft will be dissipated without any certain compensation to ELGA."). But the court in *Gen. Elec.* explained its decision as follows: the plaintiff argued that the defendant's "**current financial state** and **inability** to make its payments to date indicates that [the plaintiff] may never get paid. The Court concludes that [the plaintiff] has demonstrated that its legal remedies would be inadequate—and the harm it suffers

would be irreparable—because [the defendant] may well be unable to pay any award of damages." *Gen. Elec.*, 2009 WL 10702069, at *3 (emphasis added) (citing *ZCM Asset Holding Co. (Bermuda) v. Allamian*, No. 01 C 6250, 2002 WL 31870162, at *4 (N.D. Ill. Dec. 20, 2002)) ("Irreparable harm ***might be established by showing that a party might be judgment-proof at the end of the litigation.***") (emphasis added). The case is therefore distinguishable because here, Plaintiffs did not carry their burden to show that Defendants' "current financial state" has rendered or would render them unable to pay an award of damages at the end of this litigation. As this distinction was highlighted above, Plaintiffs provided evidence that Defendants have not made their 2024 payments to date, but not evidence that Defendants necessarily have been ***unable*** to make their payments to date. Indeed, the facts here more closely resemble other cases in which plaintiffs failed to show insolvency or an inability to pay. *See Meek*, 2021 WL 2036535, at *4-6 (denying preliminary injunction where the request for injunctive relief was based on the defendant's failure to make a payment due under an agreement, and explaining that, "Insolvency is questionable, and…[the] proposed injunctive relief is based entirely upon a fear that [the defendant] would not be able to pay a monetary judgment if [the plaintiff] prevails at trial," ***even though*** the defendant testified it did not have enough money to pay both the alleged amounts due under the contract and its operating expenses) (emphasis added); *In re First Farmers*, 2017 WL 3478813, at *10 (no "clear showing of irreparable harm and inadequacy of a remedy at law" where the plaintiff made limited, speculative arguments about the defendant's financial state and the defendant presented testimony that it was "financially healthy").

## Conclusion

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted ***unless the movant, by a clear showing***, carries the burden of persuasion." *Goodman*,

21

430 F.3d at 437 (emphasis added). Here, Plaintiffs did not carry their burden that they will suffer irreparable harm and have no adequate remedy at law absent injunctive relief. Of course, the Court understands that Plaintiffs would like assurance that they will be paid if they get a judgment at the end of this litigation, but that is not enough to warrant a preliminary injunction. "[A]ccepting [Plaintiffs'] argument would open the door to preliminary injunctive relief in a substantial majority of cases. Nearly every litigant will prefer an immediate injunction to a monetary award sometime in the future…But the unease that often accompanies litigation…does not qualify as the type of injury warranting a preliminary injunction." *E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005) (internal citation omitted).  Plaintiffs' Motion for Preliminary Injunction (dkt. 53) is DENIED.

E N T E R :


 Dated:  October 7, 2024

_____
 BETH W. JANTZ
 United States Magistrate Judge