**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| EQUIPMENT LEASING GROUP OF AMERICA, LLC, and CIBM BANK, <br><br> *Plaintiffs*, <br><br> v. <br><br> PURE MIDSTREAM, LLC; PURE AVIATION, LLC (WY); PURE AVIATION, LLC (MT); PURE AVIATION AP, LLC; and CARLO DOMENIC DIMARCO, <br><br> *Defendants*. | Case No. 1:23-cv-16099 <br><br> Hon. Beth W. Jantz <br> U.S. Magistrate Judge |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, Equipment Leasing Group of America LLC (ELGA) and CIBM Bank (CIBM), brought suit against Defendants Pure Midstream, LLC; Pure Aviation, LLC (WY); Pure Aviation, LLC (MT); Pure Aviation AP, LLC; and Carlo Domenic DiMarco, for an alleged breach of an Aircraft Financing Agreement (the AFA) and an Amended AFA. Dkt. 56 at 1–2. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Dkts. 39, 40, 114. A bench trial was held on January 20–22, 2026. This Memorandum Opinion and Order will serve as and constitute the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52.

For the reasons below, the Court finds for Plaintiffs, and against Defendants, on Plaintiffs' Counts I, II, III, IV, and V, and on Defendants' Counterclaims II, III, V, VI, VII, and VIII.  The Court denies as moot Plaintiffs' Counts VI, VII and VIII and Defendants' Counterclaim IV.[1] The

---

[1] Defendants' Counterclaims I and IX were previously dismissed. *See* Dkt. 234.

1

Court also grants Plaintiffs their attorneys' fees and costs, in an amount to be determined.

No later than 14 days after entry of this Opinion and Order, the parties shall submit a joint status report after meeting and conferring, setting forth, based upon the evidence introduced at trial and the findings of fact and conclusions of law below, (1) any agreed calculations on damages, and their position(s) on (2) remedies (including, but not limited to, repossession and sale of the Aircraft at issue) and (3) any disputed damages calculations.[2]

For the reasons stated below, Plaintiffs' Motion in Limine to Exclude Extrinsic Evidence of Amortization Table (Dkt. 224) is DENIED. Plaintiffs' Motion in Limine to Exclude Evidence of Defendant DiMarco's Other Loan (Dkt. 226) is DENIED as moot, because Defendants did not attempt to introduce the evidence that is the subject of that motion.

This Order does **not** constitute the Court's final judgment under Federal Rule of Civil Procedure 58. The Court will enter final judgment on a separate document pursuant to Rule 58 after resolving the final issues of damages and remedies. *See Thomas v. McAuliffe*, No. 21-cv-06061, 2025 WL 416805, at *8 (N.D. Ill. Feb. 6, 2025) ("Under Federal Rule of Civil Procedure 58, with a few exceptions, 'a judgment is not effective until it is set forth on a separate document and entered on the district court civil docket'") (quoting *American National Bank & Trust Co. of Chicago v. Secretary of Housing & Urban Development of Washington, D.C.*, 946 F.2d 1286, 1288 (7th Cir. 1991)); *Levato v. O'Connor*, No. 20-cv-01999, 2023 WL 3074798, at *11 (N.D. Ill. Apr. 25, 2023) (issuing findings of fact and conclusions of law after a bench trial, without entering final judgment, and ordering the parties to submit supplemental briefs regarding remedies). In other

---

[2] The parties stipulated during the pretrial conference on January 7, 2026, that the amount and reasonableness of any attorneys' fees and expenses would be determined in a separate, later hearing if necessary; the bench trial in January 2026 would (and did) address only the pleaded claims and Plaintiffs' contractual *entitlement* to attorneys' fees and costs. The parties should also include their positions on attorneys' fees and costs in their forthcoming JSR.

words, this Court is reserving on more than just costs and fees; it is also reserving on remedies and the calculation of damages. *Cf.* Fed. R. Civ. P. 58(e) ("Cost or Fee Awards. Ordinarily, the entry of judgment may not be delayed, nor the time for appeal extended, in order to tax costs or award fees.").

## STANDARD OF DECISION

Where, as here, an action is "tried on the facts without a jury," Rule 52 requires the Court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P 52(a); *see also Khan v. Fatima*, 680 F.3d 781, 785 (7th Cir. 2012) ("The trier of fact must decide whom to believe (and how much to believe) on the basis of the coherence and plausibility of the contestants' testimony, corroboration or contradiction by other witnesses, and other clues [as] to falsity and veracity."). The Court must "explain the grounds" of its decision and otherwise demonstrate a "reasoned, articulate adjudication." *Aprin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008).

Here, in adjudicating the parties' claims, the Court has considered the totality of the evidence presented at trial. In rendering this decision, the Court has considered the testimony of the witnesses who testified at trial, the parties' admitted trial exhibits, the stipulations made by the parties, and the briefs of counsel. The Court has carefully considered the weight to be accorded the evidence, including the credibility of each witness. In assessing credibility, the Court had the opportunity to observe the following witnesses: Brian Trebels, the CEO of Plaintiff ELGA; Laura Kerton, an individual employed as Plaintiff ELGA's Documentation Manager; Bob Rinaldi, Plaintiff ELGA's expert witness; Rudy Trebels, founder and managing member of Plaintiff ELGA; and Carlo DiMarco, an individual Defendant and the sole member of each Defendant corporate entity. The Court has considered, among other things, each witness's demeanor and facial expressions; intelligence; ability and opportunity to see, hear, or know the matters about which the witness testified; memory; potential for bias; and the believability of the witness' testimony in light of the

3

other evidence presented. *See, e.g.*, *Anderson v. City of Bessemer, N.C.,* 470 U.S. 564 (1985) (applying the well-settled principle that the trial judge is in the best position to assess witness credibility).

The Court has additionally considered the parties' arguments, including in several briefs (at Dkts. 249, 252, 253, 254), and the applicable law.[3] This decision on the merits incorporates the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52. To the extent that certain findings of fact may be deemed conclusions of law, they should also be considered conclusions of law. Similarly, to the extent that matters contained in the conclusions of law may be deemed findings of fact, they should also be considered findings of fact.

## PROCEDURAL HISTORY

Plaintiff ELGA initiated this suit on November 17, 2023, alleging that Defendants Pure Midstream, Pure Aviation (WY), Pure Aviation (MT), Pure Aviation AP, and Carlo DiMarco were in default on the AFA and an Amended AFA, and seeking damages and injunctive relief. *See* Dkt. 1. CIBM Bank later joined the case as a Plaintiff. *See* Dkt. 56.

Plaintiffs assert eight claims in their operative Third Amended Complaint (Dkt. 56): breach of the Financing Agreement against Pure Midstream, LLC (Count I); enforcement of the guaranty against Carlo Domenic DiMarco (Count II); enforcement of the guaranty against Pure Aviation, LLC (WY) (Count III); enforcement of the guaranty against Pure Aviation, LLC (MT) (Count IV); enforcement of the guaranty against Pure Aviation AP, LLC (Count V); writ of replevin against Pure Midstream, LLC (Count VI); injunctive relief against all Defendants to enforce ELGA's rights to take possession of its collateral (Count VII), and; confession of judgment against Pure

---

[3] The parties do not contest that the AFA requires any dispute to be decided under Illinois law. *See* Pl. Ex. 1 at 13 (paragraph 23); Dkt. 249 at 6; Dkt. 252 at 14; Dkt. 253 at 9. Accordingly, the Court applies Illinois law throughout this opinion (unless otherwise noted).

Midstream, LLC (Count VIII).

Plaintiffs ELGA and CIBM Bank are seeking to recover more than $3,700,000.00 they allege they are owed by Defendant Pure Midstream. ELGA also seeks to enforce guaranties executed in connection with the AFA against DiMarco, Pure Aviation (WY), Pure Aviation (MT), and Pure Aviation AP (collectively "Guarantors"). In addition, Plaintiffs seek replevin, confession of judgment and injunctive relief allowing ELGA to repossess certain collateral, namely, one Hawker/Beechcraft, Serial No. RC047, FAA No. N832PA ("Aircraft") and any related collateral ("Airplane Collateral") subject to the AFA.

Defendants raised nine counterclaims in their Amended Counterclaim (Dkt. 195): a claim for declaratory relief that Defendants are not obligated to repay ELGA a sum of $300,000, which the contracting parties initially contemplated would be part of the funds loaned but which was never dispersed (Counterclaim I); a claim for declaratory relief that Defendants are not obligated to repay a "prepayment penalty" in seeking to pay off the loan early (Counterclaim II); a claim for declaratory relief calculating Defendants' obligations under the AFA (Counterclaim III); a claim for declaratory relief that Defendants did not breach the AFA by retaining a separate vendor to provide maintenance on the Aircraft (Counterclaim IV); a claim for reformation of the parties' contract to include an amortization table provided by ELGA during the execution of the First Amended Financing Agreement (Counterclaim V); a claim for declaratory relief that the interest ELGA seeks to recover from Defendants exceeds the rate established by Illinois usury laws (Counterclaim VI); a claim for fraud in the inducement (Counterclaim VII); a claim for breach of contract, based on ELGA's alleged violation of the implied duty of good faith and fair dealing (Counterclaim VII); and a claim for repudiation (Counterclaim IX). The Court previously dismissed Defendants' Counterclaims I and IX, leaving only Counterclaims II–VIII at issue. *See* Dkt. 234.

**FINDINGS OF FACT**[4]

This case revolves around a loan to buy an airplane. The Parties dispute what documents made up or were incorporated into the contracts for that loan, whether ELGA misrepresented the deal, and the amount Defendants owe under the contracts, both at the time that Defendants requested a payoff as well as at the time of trial.

## I.    The Aircraft Finance Agreement

ELGA is an equipment financing company. It was founded by Rudy Trebels, and its current CEO is Brian Trebels (Rudy's son). Carlo DiMarco is the managing member of several LLCs, including Defendants Pure Midstream, Pure Aviation (MT), Pure Aviation (WY), and Pure Aviation AP. Rudy and Brian Trebels were introduced to Carlo DiMarco sometime in the last several months of 2022 through a broker at HUB Financing. *See* Tr. 17:25–18:10, 362:4–363:25. The lease on DiMarco's airplane, a 2011 Hawker Model 400 (Serial No. RC047) (the Aircraft), was expiring, and he was looking for financing options. Tr. 282:12–14, 362:17–363:7.

On or about January 3, 2023, ELGA shared with DiMarco an initial draft of a Confidential Equipment Finance Proposal. Tr. 283:2–25; *see* Pl. Ex. 5 at 1–2; Pl. Ex. 27. The Proposal was for ELGA to loan Pure Midstream $2,600,000 to finance two airplanes—the Aircraft (the Hawker Model 400) and a King Air B200. Pl. Ex. 27 at 1. In exchange, Pure Midstream would repay 72 monthly payments of $54,816. Pl. Ex. 27 at 1. DiMarco, Pure Aviation (MT), Pure Aviation (WY), and Pure Aviation AP would be guarantors on the loan. *See* Pl. Ex. 27 at 2. Shortly after this initial draft, DiMarco decided he only wanted to finance one of the planes—the Hawker Aircraft—and ELGA circulated a revised draft of the Proposal. *See* Pl. Ex. 42. This draft provided that ELGA

---

[4] Some of these findings of fact were stipulated or agreed to by the parties, as later filed on the docket (at Dkt. 243); others were found by this Court following trial.

would loan Pure Midstream between $2,500,000 and $2,700,000 to finance the Aircraft. Pl. Ex. 42 at 1. Beginning on February 1, 2023, Pure Midstream would then begin repaying 72 monthly payments of $56,707, followed by a final balloon payment of $270,000. Pl. Ex. 42 at 1. The revised draft included other changes, such as a lower security deposit and a different rate factor. Tr. 34:5–15. Both drafts of the Proposal included a provision stating: "The Payments shall be firm for the entire term of the Agreement, and Borrower's obligation to make Payments under the Agreement shall be **absolute and unconditional**." Pl. Ex. 27 at 3; Pl. Ex. 42 at 3 (emphasis added).

ELGA and Pure Midstream (an LLC of which DiMarco is the managing member) then executed a document titled Aircraft Financing Agreement, with an acceptance date of December 31, 2022, to enable Pure Midstream to finance the Aircraft. Dkt. 243 ¶ 1; *see* Pl. Ex. 1. The AFA provided in Section 1 that Pure Midstream would "pay the seventy-three monthly payments"—which the AFA defined as "the Indebtedness"—consisting of "72 payments of $56,707.00" and "1 payment of $270,000." Pl. Ex. 1 at 1. The AFA also defined "Indebtedness" at other points as: "all renewals, extensions or substitutions for any such instrument [referring to the AFA] (including but not limited to all payments, late charges, collection costs, attorney fees)"; any additional payments ELGA might be required to make (and the amount of the reasonable expenses of Lender incurred in connection with such payment) as a result of Pure Midstream's "fail[ure] to make any payment under th[e] [AFA] or fail[ure] to perform any of its other obligations in th[e] [AFA]"; Pl. Ex. 1 at 2, 10 (in that instance, listed as "additional Indebtedness"). The AFA does not include any reference to any specific interest rate on the amounts financed. *See* Pl. Ex. 1 at 9 (except in the case of a default); Tr. 135:1–3. The AFA provided at Section 1.2 that Pure Midstream "may prepay the Indebtedness," and that Pure Midstream's "obligation to pay all installment payments and all other amounts payable under this Agreement is **absolute and unconditional** under any and all

7

circumstances." Pl. Ex. 1 at 2 (emphasis added). Rudy Trebels testified that ELGA would not have entered into the AFA without this "absolute and unconditional" provision. *See* Tr. 296:23–25 (Rudy Trebels: "Q. Would ELGA have entered into this agreement had that term not been in it, the absolute and unconditional payments due? A. No.").

The AFA provided ELGA with "a security interest in all of [Pure Midstream's] respective right, title and interest in and to" the Aircraft, and ELGA was permitted to file a UCC financing statement relating to the Aircraft. Pl. Ex. 1 at 16; Dkt. 243 ¶ 2. The AFA also required Pure Midstream, "[a]t its sole expense," to repair and maintain the Aircraft, use the Aircraft in a careful manner, and to "maintain and fund the existing ESP Program Agreement with Pratt & Whitney Canada," among other requirements. Pl. Ex. 1 at 3.

The AFA established multiple "Event[s] of Default." Pl. Ex. 2 at 8. Relevant here, such Events of Default included Pure Midstream "fail[ing] to pay any installment payment or other amount due . . . within 10 days of its due date"; Pure Midstream "fail[ing] to perform or observe any of its obligations in Sections 3, 8, 9, or 18 hereof" (relating to maintenance and use of the Aircraft, the provision of financial statements, and acknowledgement of ELGA's assignment of its rights under the AFA); or Pure Midstream or any guarantor "becom[ing] insolvent or bankrupt." Pl. Ex. 1 at 8.

The AFA permitted ELGA to "sell, assign, transfer or grant a security interest in all or any part of [Pure Midstream's] rights, obligations, title or interest in the Collateral, this Agreement, or the amounts payable under this Agreement to any entity." Pl. Ex. 1 at 11. Any such transferee would "succeed to all of [ELGA's] rights in respect to this Agreement." Pl. Ex. 1 at 11. The AFA also prohibited Pure Midstream, "directly or indirectly," from "creat[ing], incur[ring], grant[ing], assum[ing] or allow[ing] to exist any lien on its interest in this Agreement, the collateral or any

part thereof." Pl. Ex. 1 at 11 (capitalization altered).

The AFA includes a provision on usury. That provision states: "Regardless of any provision in this Agreement, or any document in connection therewith, [ELGA] shall not be entitled to receive, collect or apply, as interest on any Obligation, any amount in excess of the Maximum Amount (the 'Excess'). As used herein, 'Maximum Amount' shall mean the maximum amount of interest which would have accrued if the unpaid principal amount of the Obligation outstanding from time to time had borne interest each day at the maximum amount of interest which lender is permitted to charge on the Obligation under the Usury Laws" of the State of Illinois. Pl. Ex. 1 at 12. "If [ELGA] ever receives, collects or applies as interest any Excess, such Excess shall be deemed a partial repayment of Indebtedness and treated hereunder as such; and if the Indebtedness is paid in full, any remaining Excess shall be paid to Pure Midstream." Pl. Ex. 1 at 12. On cross-examination, Brian Trebels was asked: "And by including this provision, you were agreeing, were you not, that ELGA would not violate any laws in Illinois related to usury?" to which he responded: "Correct." Tr. 138:10–13.

Finally, the AFA provides that "[t]his Agreement may be amended, but only by a written amendment signed by [ELGA] and [Pure Midstream]." Pl. Ex. 1 at 13. DiMarco testified that an amortization table either was or should have been involved with the AFA. Tr. 396–400. Despite this, there was no written evidence presented that any amortization table was attached to, explicitly referenced by, or explicitly incorporated into the AFA. *See* Pl. Ex. 1.

The AFA also includes a provision stating that Pure Midstream "shall pay all reasonable costs, expenses and damages incurred by [ELGA] because of the Event of Default or its actions under this section, including, without limitation any collection agency and/or attorney fees and expenses, and any costs related to the repossession, safekeeping, storage, repair, reconditioning or

9

disposition of the Collateral." Pl. Ex. 1 at 9.

Defendants Pure Aviation, LLC (a Wyoming LLC), Pure Aviation, LLC (a Montana LLC), and Pure Aviation, AP, LLC—all LLCs of which DiMarco is the sole member—executed Corporate Guarantees, and DiMarco executed a Limited Personal Guaranty. Dkt. 243 ¶ 3. Under the executed guaranties, all the corporate Guarantors guaranteed all the obligations of Pure Midstream to ELGA under the AFA in the event of Pure Midstream's default. *See* Pl. Ex. 1 at 47–52. DiMarco's personal guarantee made him unconditionally liable for 50% of the obligations of Pure Midstream to ELGA (other than expenses) and for 100% of the expenses of ELGA in the event of Pure Midstream's default. *See* Pl. Ex. 1 at 45–46.

The law firm of Jones Walker represented Pure Midstream and the corporate Guarantors in conjunction with the preparation and execution of the AFA; ELGA was represented by the law firm of O'Rourke & Moody, who also represented ELGA and CIBM at trial. Tr. 112:11–117:19, 373:15–16 (to DiMarco: "Q. And you retained a law firm by the name of Jones Walker; is that right? A. Yes."); Pl. Ex. 58 at 1. After reviewing various documents, including the AFA and the Security Agreement for Additional Collateral—but not including any written amortization table—Jones Walker produced an opinion letter stating that the AFA "constitutes the legal, valid, and binding obligations of Borrower, enforceable in accordance with its terms." Pl. Ex. 58 at 1, 5. ELGA relied on that opinion when entering into the AFA. *See* Tr. 117:7–12 ("Q. Did ELGA rely on this opinion and specifically that set forth in subparagraph 5? A. Yes. Q. Would ELGA have funded this agreement without the opinion expressed in Exhibit 5—in Exhibit 58, subparagraph 5? A. No.").

On February 8, 2023, ELGA funded a loan for financing the Aircraft for $2,400,000. Tr. 126:22–127:9; Pl. Ex. 60. ELGA provided $2,400,000 to Pure Midstream with the understanding

10

that it would provide an additional $300,000 if Pure Midstream agreed to provide ELGA a first-priority security interest in certain rail cars owned by Pure Midstream. Dkt. 243 ¶ 5. But that $300,000 was never funded based on the later agreement of the parties. Tr. 41:4–43:15, 376:17–377:25.

On March 13, 2023, in connection with the AFA, ELGA perfected its security interest in the Aircraft. Pl. Ex. 54 at 1. On May 30, 2023, SouthStar Financial, one of Pure Aviation (MT)'s creditors, perfected a junior lien on the Aircraft in the amount of $2,750,000. Pl. Ex. 54 at 1; Tr. 475:10–476:16. The SouthStar lien remained in place as of the time of trial. Tr. 476:10–12.

## II.    The Amended Aircraft Finance Agreement

Sometime after March 27, 2023, Pure Midstream LLC and ELGA executed the First Amendment to Aircraft Financing Agreement and Addendum (Amended AFA). *See* Pl. Ex. 2; Tr. 63:4–64:5, 393:18–394:7. The Amended AFA was backdated to March 15, 2023. Pl. Ex. 2 at 2. The Amended AFA (a) reflected that Pure Midstream had declined to accept the additional $300,000 that had not been disbursed when the loan was originally issued, and (b) therefore adjusted the monthly payments due under the AFA. Dkt. 243 ¶ 7; Pl. Ex. 63 at 1. The Amended AFA amended Section 1 of the AFA by listing Pure Midstream's payments as follows: two (2) payments of $56,707, seventy (70) payments of $50,309, and one (1) payment of $240,000. Pl. Ex. 2 at 1. It also amended Section 1 of the AFA by providing that Pure Midstream would pay a Documentation Fee of $1,995, a provision which was inadvertently left out of the AFA. Pl. Ex. 2 at 1. No interest rate is listed in the Amended AFA. *See* Pl. Ex. 2 at 1. The text of the Amended AFA does not by its terms explicitly refer to or incorporate any amortization table. *See* Pl. Ex. 2 at 1.

The conversations regarding the Amended AFA began in March 2023. On March 10, 2023, Laura Kerton, ELGA's Documentation Coordinator, emailed DiMarco a draft Amended AFA for his signature. *See* Pl. Ex. 63. The purpose of the Amended AFA was to address DiMarco's decision

not to take the additional $300,000 of funding. Tr. 166:13–167:16, 385:8–10. This email did not include or refer to an amortization table. *See* Pl. Ex. 63 at 1–3.

On March 21, 2023, Arlene Marinelarena, a Sales Lease Coordinator at ELGA, emailed DiMarco, stating: "Attached to this email you will find the amortization schedule as requested. Please be aware, this amortization schedule will only be valid upon receipt of the signed and completed amendment which was provided to you on 3/10/23 by Laura Kerton." Def. Ex. 26 at 2.[5, 6] Sales Lease Coordinators at ELGA are responsible for sending proposals and approvals and gathering financial information; they do not have authority to negotiate financial transactions. Tr. 170:14–25.

On March 24, 2023, Kerton emailed DiMarco again. *See* Pl. Ex. 18. She stated: "Based on your conversation with Rudy [Trebels], we created a revised amortization schedule and a corresponding amendment to the Aircraft Financing Agreement and the Addendum. I have attached the revised amortization schedule and the Amendment. Please be advised that the amortization schedule is provided as a courtesy and ELGA makes no representations that such amortization schedule meets generally accepted accounting principles. The attached amortization schedule is also not intended to be used for payoff purposes." Pl. Ex. 18 at 1. Kerton explained that she sent that language "because amortization schedules are not part of the normal documentation process and we [ELGA] don't send them out. Carlo had requested one. At the direction of Rudy, I sent him that,

---

[5] Plaintiffs filed a motion in limine seeking to exclude (based on the AFA's integration clause) "evidence and testimony regarding an amortization schedule that post-dates and falls outside the parties' integrated written agreement." Dkt. 224 at 1. The Court took the motion under advisement, *see* Dkt. 236, and now DENIES the motion. One of the primary factual disputes in this case was whether the amortization table was included in the Amended AFA. It was necessary for the Court to receive evidence on that dispute, and thus the motion seeking to exclude such evidence is denied.

[6] At trial, Defendants moved without objection to admit Defendants' Exhibits 26 and 68. *See* Tr. 544:19–545:11. For purposes of a clear record, the Court clarifies that those Exhibits are ADMITTED.

12

but it was only as a courtesy. He's not to rely on it. It doesn't reflect the gross payments of our contract." Tr. 173:7–12.

On March 27, 2023, Kerton emailed DiMarco a third time to provide another revised amortization schedule and draft Amended AFA. *See* Pl. Ex. 13. As before, Kerton stated: "Please be advised that the amortization schedule is provided as a courtesy and ELGA makes no representations that such amortization schedule meets generally accepted accounting principles. The attached amortization schedule is also not intended to be used for payoff or buy out purposes. The attached amortization schedule becomes effective upon your return of the executed Amendment to Aircraft Financing Agreement." Pl. Ex. 13 at 1; Tr. 173:24–175:4. DiMarco never followed up with Kerton about her warnings. Tr. 175:19–176:3. DiMarco returned the signed Amended AFA to ELGA on or about March 29, 2023. Tr. 176:3–5.

DiMarco testified that he believed that the provision of the amortization table during the discussions of the Amended AFA was to show how ELGA would allocate Pure Midstream's payments between principal and interest. Tr. 451:21–453:20. But Brian Trebels explained that ELGA provided an amortization table for the purpose of demonstrating how Pure Midstream's monthly payments would change following the $300,000 reduction of the loan. Tr. 56:1–17. As Trebels explained it, the fact that the amortization table ELGA provided included columns showing monthly interest and principal was simply because "[t]hat's what the software spits out." Tr. 55:21, 132:4–22. Trebels further testified that ELGA's warnings to DiMarco about the amortization table were "intended to provide a disclaimer basically saying that we [ELGA] make no representation here. This [the amortization table] is not to be used. It's not part of the documentation. It's just showing that there's a production [*sic*] of the funding amount of $300,000." Tr. 51:3–7. Both Brian and Rudy Trebels explained that the contract still required Pure Midstream to pay all of the gross

payments, even if it elected to prepay. Tr. 27:17–20, 307:13–15. And Kerton explained at trial that the language referring to the amortization table becoming "effective" upon DiMarco's signature was "really [] a poor way of me saying that the reduced payments didn't become effective until he signed the amendment." Tr. 214:8–11.

## III.     Plaintiffs' Expert Witness

At trial, Plaintiffs called Bob Rinaldi as an expert on industry standards in the field of equipment financing and leasing. *See* Tr. 221–275.[7] Rinaldi is the president of Rinaldi Advisory Services. Tr. 222:9–13. He began his career in the equipment finance and leasing industry in or about 1984. Tr. 224:20–230:20. He founded an equipment leasing company in the 1980s, and he sold that company in 1996 to a community bank at a time when the company had between $40 and $60 million in new lease and loan originations. Tr. 224:20–230:20. He continued to work for that bank until it was bought by a larger bank in 2004, at which time his equipment leasing group was generating just under a billion dollars annually in new leases and loans and held about $2.5 billion

---

[7] At trial, Defendants did not object to Rinaldi's qualifications as an expert witness (nor was any *Daubert* motion filed before trial). They did, however, object during trial to the relevance of his testimony to the ultimate legal question of whether the AFA's "absolute and unconditional" clause requires payment of the entire balance. *See* Tr. 239:2–14 ("Your Honor, we don't contest that he's an expert in the field of equipment finance and leasing. . . . I don't understand the relevance of his opinion because his opinion is essentially, 'This is how the industry typically works, these are the types of agreements that we find in this industry, and I think this agreement is comparable to what I find in the industry.' But that's not the question. The question is what does this contract say, you know. What did the parties agree to. And what is standard in the industry doesn't matter because . . . parties are free to negotiate their own terms and conditions, and those terms and conditions can vary."). In light of Defendants' position, and of Rinaldi's qualifications, the Court found at trial that Rinaldi qualifies as an expert witness and admitted his testimony under Federal Rule of Evidence 702. Tr. 239:22–240:1; *see Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017) ("Any assessment of the admissibility of expert witness testimony begins with Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert*, as together they govern the admissibility of expert witness testimony. This is true even when, as here, our jurisdiction rests on diversity.") (internal citations and quotation marks omitted). At trial, the Court took Defendants' relevance objection under advisement. *See* Tr. 239:22–240:17. For the reasons discussed below in the Court's Conclusions of Law, the Court now OVERRULES that objection.

14

in assets. Tr. 224:20–230:20. He remained with that bank until it was bought by an even larger bank in 2008, at which point his group was generating about $3.5 billion in revenue and held about $9.5 billion in assets. Tr. 224:20–230:20. In 2009 or 2010, he left to become a consultant. Tr. 224:20–230:20. In 2014, he purchased a small leasing company, then sold it in 2015 to another community bank. Tr. 224:20–230:20. In 2018, he founded Rinaldi Advisory Services. Tr. 224:20–230:20. He has also been a member of and held various leadership positions in industry trade groups, including Equipment Leasing and Financing Association (ELFA) and National Equipment Finance Association (NEFA). Tr. 224:20–230:20.

Rinaldi testified that he reviewed the AFA and the Amended AFA. Tr. 241:25–243:17. He testified he was "familiar with provisions in commercial finance agreements commonly referred to as absolute and unconditional payment obligations." Tr. 243:18–21. He testified that in the equipment leasing and financing industry, the term "absolute and unconditional" means, "essentially, your payments must be made no matter what." Tr. 243:22–244:2. "[T]he term used in the industry" for these provisions "is 'hell and high water.' So in other words, the payments must be made from hell or high water . . . ." Tr. 243:22–244:2. He testified that a contract provision "requiring the unconditional, the absolute and unconditional payment of the entire lease term" is "not only standard, it's a requirement" in the equipment leasing and financing industry, because "the capital markets wouldn't exist to finance these types of transactions if that didn't exist." Tr. 245:4–11; *see also* Tr. 250:4–251:7 (testifying that "absolute and unconditional" clauses are "more than customary" in the equipment leasing and financing industry, they are "required to have a financeable contract and a financeable instrument that could be financed through other institutions behind the scenes").

Rinaldi also testified that provisions allowing prepayment of indebtedness are less common

but still utilized in the industry. *See* Tr. 246:23–247:1 ("I've seen it before. Most cases they don't provide a provision to prepay."). In his view, such prepayment provisions could be included because in "[t]he majority of the time," the borrower intends to "sell the company and they have to clear up any indebtedness in the sale of that company prior to the sale. So a borrower will pay off all of their obligations to do that. So if a borrower thinks that they are an entity that's going to be sold maybe sometime in the future, they may want to have this if they've been thinking far enough ahead." Tr. 247:24–248:7. Rinaldi testified that another reason for a prepayment provision would be to ensure that there is no additional charge for prepaying. He explained he "often" sees "penalties associated with prepayment," which are "usually a percentage of [] the indebtedness unpaid." Tr. 252:6–253:8. The purpose of including a provision allowing prepayment would be to ensure there is no charge for making a prepayment. *See* Tr. 252:6–253:8.

When asked about the AFA's usury provision, Rinaldi testified that he sees usury provisions in equipment finance agreements "fairly often," but that he was not qualified to address how such a provision operates. Tr. 270:21–271:9. He testified that he has never "encountered a situation where a borrower has alleged that an unconditional and absolute payment provision is usurious." Tr. 275:4–7.

## IV.    Plaintiff CIBM Bank

Plaintiff CIBM Bank does business with ELGA. In December 2021, ELGA and CIBM entered into a Master Lease Receivable Sales Agreement, which permitted ELGA from time to time to sell to CIBM the right to receive payments owed to ELGA pursuant to its financing agreements with borrowers. Pl. Ex. 10 at 1. In other words, ELGA and CIBM had a standing agreement for CIBM to purchase assignments from ELGA. ELGA and CIBM could enter into such sales by executing a "Lease Receivable Sales Supplement" to this Master Agreement. Pl. Ex. 10 at 1. Under the Master Agreement, ELGA would retain a residual interest in the collateral underlying a

16

particular financing agreement. For example, the Master Agreement states: "Seller's [ELGA's] interest in the residual value of the Equipment and Seller's interest in the Equipment which remains pursuant to the Lease shall remain with Seller after the Purchased Rents have been paid in accordance with the terms of this Agreement, the Supplement, and the Lease." Pl. Ex. 10 at 1. It also states: "Purchaser [CIBM] acknowledges that Seller [ELGA] retains the residual value of the Equipment subject to the Lease, and accordingly agrees to execute any and all documents and take any and all necessary actions so that, upon Purchaser's receipt of all Purchased Rents during the Purchased Rent Term, such residual interest along with all Collateral remaining shall be transferred by Purchaser back to Seller." Pl. Ex. 10 at 3. The Supplement also provided that ELGA's sale to CIBM "shall not relieve [ELGA] from, or cause [CIBM] to be liable for, the obligations of [ELGA] under the Lease. All payments of Purchased Rents due . . . are to be made by the Lessee directly to [ELGA], who shall service such Leases on behalf of [CIBM]. In the event that a Lessee fails to make a monthly rental payment within the time specified under its respective Lease (including any applicable grace period), [CIBM] shall be entitled to the monthly rental payment together with interest thereon . . . ." Pl. Ex. 10 at 2.

On April 28, 2023, ELGA and CIBM executed one such Lease Receivable Sales Supplement, "whereby CIBM agreed to purchase the monthly payments due ELGA from Pure Midstream, LLC." Dkt. 243 ¶ 9; *see* Pl. Ex. 10 at 13. The Supplement provided that CIBM would pay ELGA $2,882,793.85, and in turn ELGA would assign to CIBM its right to collect "monthly payment[s]" of $50,309 from Pure Midstream under the Amended AFA beginning on May 5, 2023. Pl. Ex. 10 at 13 (capitalization altered). The Supplement stated that the "purchased rents" were identified on an "Exhibit A," but no Exhibit A was attached to the document. *See* Pl. Ex. 10 at 13 (capitalization altered). However, Brian and Rudy Trebels each testified that ELGA sold the monthly payments

17

to CIBM but retained the right to collect the final balloon payment of $240,000. Tr. 122:24–123:10, 326:1–13.

**V. Asserted Instances of Default, Pure Midstream's Late and Missed Payments and Payoff Requests, and ELGA's Asserted Damages**

Pure Midstream made all of its payments on time until August 2023. Days before the August 1, 2023 payment was due, DiMarco texted Rudy Trebels asking that the payment be postponed and indicating that he was going through a refinance. Pl. Ex. 35. There was no response by text, but DiMarco testified that he thinks he spoke to Rudy Trebels on the phone and told him that he was going through a refinancing and that he wanted a payoff of the AFA with ELGA. Tr. 402:11–15. Later that day, DiMarco emailed Laura Kerton, asking "[c]ould you move till the 15th just for the month of Aug. our 1st of the month pmt. As per our phone call..." Pl. Ex. 37. ELGA agreed that DiMarco could submit the August 1, 2023 payment by August 15 without resulting in default, but the payment would still incur a 10% late fee pursuant to Section 15 of the AFA. Pl. Ex. 16 at 2.

By mid-August, the August 1, 2023 payment had not been received. On Wednesday, August 23, 2023, Brian Trebels texted DiMarco: "I haven't checked with accounting but did you send in payment?" Pl. Ex. 19 at 1. Four days later, on Sunday, August 27, DiMarco responded: "Yes sent on Friday my controller was out of the office[.]" Pl. Ex. 19 at 1.

On August 29, 2023, Pure Midstream requested a payoff letter in writing. Tr. 454:5–7. DiMarco testified at trial that he wanted a payoff because a potential buyer approached him about purchasing the Aircraft. Tr. 454:23–457:12. He was not worried about making late payments because he believed that "when you order a payoff, oftentimes you don't make a payment. If there's

payment due, it just gets added to the payoff," along with "a couple of late fees." Tr. 455:21–456:6.[8]

By August 30, ELGA still had not received the August 1, 2023 payment. On August 30, Brian Trebels texted DiMarco: "Carlo—my accounting team does not see the payment. I have advised them to pull both payments the 8/1 and 9/1 payment and late fee on Friday 9/1. If you have proof otherwise please email immediately." Pl. Ex. 19 at 1. DiMarco responded that day: "Checking on 8/1[.] FYI we also ordered a payoff as well[.]" Pl. Ex. 19 at 1.

On August 31, 2023, it was still unclear whether Pure Midstream had made the August 1 payment. Brian Trebels texted DiMarco: "Please confirm 8/1 was not paid as I have instructed staff to pull 8/1, 9/1 and late fee tomorrow. Can call them off by 10:30 central if proof of 8/1 payment supplied and then only pull 9/1 and late fee tomorrow. Thanks!" Pl. Ex. 19 at 2. DiMarco responded several days later on September 5: "Could you confirm we have asked for a payoff statement twice. We are closing by the 10th on it[.]" Pl. Ex. 19 at 2.

In response to the payoff inquiries, in September 2023, ELGA prepared two separate letters to Pure Midstream. The first, dated September 5, 2023, listed the total payoff amount as $3,360,076. Pl. Ex. 11 at 2. The second, dated September 6, 2023, stated that Pure Midstream was in default and listed the payoff amount as $3,470,604. Pl. Ex. 8 at 1. This additional amount

---

[8] At trial, Plaintiffs objected to DiMarco's explanation for requesting the payoff and allowing late fees to accrue, as hearsay. Tr. 456:12–457:2. Defendants responded that the testimony was not offered to prove the truth of the assertion that the potential buyer was interested in purchasing the Aircraft, but instead to show DiMarco's motivation for the actions he took with respect to the loan. The Court took the objection under advisement and now OVERRULES the objection. The Court will consider the testimony not for the truth of whether the potential buyer was in fact interested in purchasing the Aircraft, but instead as evidence of the reasons for DiMarco's actions. *See* Fed. R. Evid. 801(c)(2).

19

included the August and September 2023 payments that ELGA had not received and the attendant bounce fees and late fees. Tr. 90:1–25; Pl. Ex. 50.

DiMarco immediately communicated with ELGA representatives about the payoff amount. On September 5, he responded to ELGA's first payoff letter stating: "Find attached the loan Amortization for that we have… Its also worth noting that we have a $100k deposit held as security as well that needs to be discounted [*sic*]." Pl. Ex. 39 at 4. Later that evening, DiMarco texted Rudy Trebels: "On this deal. I'm being told we are in a lease. This was a purchase with a balloon… I'm also being told my payoff is over $1.3m higher than actual of the deal? It's only been 7 mos how could this be [*sic*]?" Pl. Ex. 35 at 1. Rudy Trebels responded the next morning: "Let me check and will get back to you. It is not a lease but a finance agreement—but not made to be paid off early." Pl. Ex. 35 at 1. DiMarco replied: "How is it not made to be an early payoff? We have an amo schedule[.] It has to be[.] That's what we agreed to… See the Amo [*sic*]." Def. Ex. 47 at 1. On September 6, DiMarco then texted Brian Trebels: "There is a mistake on the payoff. When is a good time to review?," and asserted that the payoff "needs to follow the loan amortization schedule as per our agreement." Pl. Ex. 19 at 2–3. Brian Trebels responded: "[I] was just informed your payments bounced for both 8/1 and 9/1. Need you to make payment via wire today. Another late fee now incurred as well as bounce fees. Will take a look at payoff once payment received as it is moving target with the bounces." Pl. Ex. 19 at 2. DiMarco replied that he "need[ed] a payoff number to close since it's tomorrow or Friday," and that "[i]t needs to follow the loan amortization schedule as per our agreement." Pl. Ex. 19 at 3. Brian Trebels said he "w[ould] check agreement as I thought it was full payout." Pl. Ex. 19 at 3. Later that day, Brian Trebels emailed DiMarco a screenshot of an Excel spreadsheet showing how ELGA was calculating the payoff amount. *See* Pl. Ex. 39 at 3. DiMarco responded on September 7 that the screenshot "ha[d] payments missing

20

and it doesn't comport to the Loan amortization that Laura [Kerton] and Rudy [Trebels] provided during and after for the amended deal after signing [*sic*]." Pl. Ex. 39 at 2. Trebels responded to that email by stating: "Please note that when we talked yesterday i mentioned that you are in default behind the 2 payments and that the amortization that was sent over specifically stated that this was not to be for any payoffs or buyouts." Pl. Ex. 51 at 1. Brian Trebels testified at trial that he did not take the amortization table into account when calculating the payoff letter "[b]ecause it's not part of the contract." Tr. 94:8–15.

On September 21, 2023, ELGA, through counsel, sent Pure Midstream a letter stating that it was in default (based on missed payments) and that it would accelerate all amounts due if the account was not made current within ten days. Pl. Ex. 9. On September 27, 2023, ELGA received Pure Midstream's August 1, 2023 payment. Tr. 97:16–24; Pl. Ex. 20 at 1. On September 29, 2023, an ELGA representative told DiMarco by email that the amount to bring his account current was $60,470.80, which included the September 1, 2023 payment, plus late fees and bounce fees from both August and September. Pl. Ex. 39 at 1. Pure Midstream made the September 2023 payment on November 7, 2023. Pl. Ex. 20 at 5; Tr. 146:14–16. However, Pure Midstream's account was never brought current after ELGA's September 2023 default letter, as other monthly payments had come due by the time subsequent payments were made. Tr. 146:23–148:10.

ELGA never received Pure Midstream's January 1, 2024 payment nor any monthly payments thereafter. Tr. 148:11–18, 186:2–4. DiMarco testified that in April 2024 he attempted to wire ELGA $220,000, but "[a]pparently they didn't" receive it. Tr. 407:9–408:15.[9] Beyond that, DiMarco testified that he ceased making payments in 2024 because "after the lawsuit was filed

---

[9] Defendants offered no further evidence at trial on this assertion, nor on any further attempts to actually have the payment reach ELGA.

and we started looking through everything, we realized that this was way outside of Illinois' statute usury provision," and because he believed that ELGA was "misapplying the payments." Tr. 470:13–471:12.

In November 2023, Laura Kerton requested that the title company perform a title search on the Aircraft. Tr. 180:1–14; *see* Pl. Ex. 54. She discovered that on April 1, 2023—only a few days after the Amended AFA was signed and executed—SouthStar Financial, LLC, one of Pure Aviation (MT)'s lenders, had placed a lien on the Aircraft in the amount of $2,750,000. Tr. 180:11–14; Pl. Ex. 54 at 1. The lien was junior to ELGA's. Pl. Ex. 54 at 1. Brian Trebels testified that when ELGA contacted Pure Midstream about this lien, Pure Midstream stated "something along the lines of they didn't know that they couldn't do that, couldn't put a lien on the claim." Tr. 102:3–15.

In March 2025, Pure Aviation (WY), one of the AFA's Guarantors, filed for bankruptcy. Tr. 380:13–382:24. ELGA did not receive any monies from Pure Aviation (WY) as a result of those bankruptcy proceedings. Tr. 382:6–8.[10]

ELGA alleges that it sustained the following damages: 65 monthly payments of $50,309 each; one balloon payment of $240,000; three NSF charges of $50 each; three late fees of $5,030.90 each; less $216,477.80 in payments made; less the $100,000 security deposit, for a total

---

[10] Plaintiffs also questioned DiMarco on redirect about a 2017 bankruptcy proceeding, in which the bankruptcy court entered a judgment stating in relevant part that DiMarco procured a loan "by false pretenses, false representations, and actual fraud." Tr. 479:2–482:19. Defendants' counsel objected to the questioning as outside the scope of Defendants' counsel's cross-examination. Tr. 479:7–480:25. Plaintiffs' counsel responded that DiMarco opened the door to this evidence by testifying on cross-examination about his preparation of financial statements in connection with the loan at issue in this litigation, and that the bankruptcy evidence is "independently relevant" to DiMarco's credibility "because it's a fraud judgment." Tr. 479:23–480:14. At trial, the Court took the objection under advisement and now SUSTAINS the objection. The questioning was outside the scope of Defendants' counsel's cross-examination.

of $3,208,849.90. Dkt. 253 at 21. They also seek default interest through judgment (in the amount of $1,681,535.98 through January 30, 2026). Dkt. 253 at 21. They also seek reimbursement of $268,912.62 in costs under the AFA, which they contend are for aircraft storage, court costs, expert fees, title searches, and inspections. Dkt. 253 at 21; *see also* Pl. Ex. 70. Plaintiffs also seek attorneys' fees (with an estimate of $500,000).

Defendants contend that they owe ELGA no more than $2,215,502. *See* Dkt. 252 at 16–17. They say that when calculated correctly, Pure Midstream owed ELGA $1,992,918 in outstanding principal at the time it ceased making payments, and that it should not be required to pay any interest on that amount "because the Amended AFA was either invalid or void." Dkt. 252 at 16. But if any interest is charged at all, Defendants say it should be capped at 5% annually under Illinois' usury laws, which would bring the total owed to at most $2,215,502 through January 2026. Dkt. 252 at 16–17.

### CONCLUSIONS OF LAW

This is essentially a breach of contract case (and all of Plaintiffs' counts go to that issue, or remedies), based on Defendants' alleged failure to make payments and other defaults under the AFA. Defendants allege several counterclaims in response.

The Parties dispute how a requested payoff should have been calculated, what amount would be due, and what documents formed the underlying agreement. ELGA argues, based on the plain text of the AFA and Amended AFA, that prepayment still would have required Pure Midstream to pay all the remaining monthly payments in full at the time of prepayment. Defendants argue that prepayment should have required them to pay only the principal amount of the remaining payments, as that would have been the point of paying off a loan early. Defendants do not believe that they should be required to pay what they call "unaccrued interest." Defendants further argue that ELGA's claimed payoff amounts included a prepayment penalty (by accelerating all

23

principal and interest payments through the entire term of the loan). Defendants argue that this is not allowed pursuant to the relevant agreements, particularly given the amortization schedule that they allege was part of the parties' agreements. Plaintiffs argue in response that the schedule is not part of the agreements and is impermissible parol or extrinsic evidence.

## I.       Standing

Before addressing the parties' claims and counterclaims, the Court must first address Defendants' argument that ELGA lacks Article III standing (Defendants do not challenge that CIBM has standing). *See* Dkt. 249. Defendants argue that any injury ELGA might have suffered is not redressable by an order directing Defendants to pay ELGA because ELGA sold its receivables under the AFA and Amended AFA to CIBM Bank and "would be obligated to in turn pay those damages to CIBM." Dkt. 249 at 8. The Court disagrees with Defendants' standing argument.

"[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The "plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (internal citation omitted). "[S]ubject matter jurisdiction is a fundamental limitation on the power of a federal court to act." *Del Vecchio v. Conseco, Inc.*, 230 F.3d 974, 980 (7th Cir. 2000). "It has been the virtually universally accepted practice of the federal courts to permit any party to challenge or, indeed, to raise sua sponte the subject matter jurisdiction of the court at any time and at any stage of the proceedings." *Sadat v. Mertes*, 615 F.2d 1176, 1188 (7th Cir. 1980). "The duty of the district court

24

to undertake this jurisdictional inquiry has been codified in the Civil Rules," *id.*, which state that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action," Fed. R. Civ. P. 12(h)(3).

"The party invoking federal jurisdiction"—here, ELGA—"bears the burden of demonstrating the plaintiff's standing to sue under Article III." *Sosa v. Onfido, Inc.*, 600 F. Supp. 3d 859, 867 (N.D. Ill. 2022) (citing *Bryant v. Compass Group USA, Inc.*, 958 F.3d 617, 620 (7th Cir. 2020)).[11] Each standing element "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. "[A]t the final stage, th[e] facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Id.* (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n.31 (1979)).

ELGA suffered an injury in fact caused by Defendants when Pure Midstream stopped making timely monthly payments on the loan, and then stopped paying altogether beginning in 2024. *See TransUnion*, 594 U.S. at 425 ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."). Defendants contend that this is insufficient for standing purposes because ELGA is required under the Supplement to the Master Lease Receivables Agreement to turn those payments over to CIBM. But that argument "conflates Article III standing with the merits of [a] breach of contract claim." *Levey v.*

---

[11] The parties both posit that Defendants have the burden of proof on the standing issue because this is a diversity case, and under Illinois law, lack of standing is an affirmative defense that must be established by its proponent. *See* Dkt. 249 at 6 (citing *PNC Bank, N.A. v. Boytor*, No. 18-cv-04167, 2021 WL 4133540, at *8 (N.D. Ill. Sept. 10, 2021)); Dkt. 254 at 4; *see also Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 494 (Ill. 1988). But in federal court, questions of Article III standing are controlled by federal law, even when the underlying claims are predicated on diversity jurisdiction. *See Bryant v. Compass Group USA, Inc.*, 958 F.3d 617, 620 (7th Cir. 2020). Ultimately, though, it is not necessary to definitively resolve who has the burden of proof, because this Court's standing ruling would not change even if the burden of proof was on Plaintiffs.

*Concesionaria Vuela Compania de Aviacion, S.A.P.I. de C.V.*, 529 F. Supp. 3d 856, 862 (N.D. Ill. 2021). "[F]or standing purposes, Plaintiff need not definitively establish a contractual entitlement to a refund, but a cognizable injury-in-fact traceable to [Defendants'] conduct." *Id.* ELGA did so at trial , for the following reasons.

The injury of contract default would be redressed by a decision in Plaintiffs' favor. In the event of default, the AFA provides ELGA with the option to take possession of the Aircraft and sell it. Pl. Ex. 1 at 8–9. That remedy was transferred to CIBM when CIBM purchased Pure Midstream's receivables from ELGA. *See* Dkt. 10 at 2–3 (providing that in the event of a default, the Purchaser [CIBM] may exercise all rights and remedies not inconsistent with the terms of the Lease with respect to the Purchased Rents or Collateral"). ELGA nevertheless under the Master Lease Receivables Agreement "retains the residual value of the Equipment subject to the Lease" and is entitled to any residual value in the collateral after CIBM is paid in full. Pl. Ex. 10 at 3 (paragraph 8). In other words, in the event of a default, CIBM could repossess and sell the Aircraft, but ELGA remains entitled to any proceeds from the sale above and beyond what CIBM is owed. ELGA's retention of this residual value would be vindicated by a holding in its favor.

Alternatively, the Court finds that when ELGA sold the monthly loan payments to CIBM, ELGA still retained the right to collect the final balloon payment of $240,000. ELGA representatives testified convincingly and consistently that they only sold the monthly payments under the AFA to CIBM, and not the final balloon payment. Tr. 122:24–123:10, 326:1–13. Although the Supplement does not include any Exhibit A (the document that would specifically identify which receivables ELGA sold to CIBM), it does identify "monthly payments," Pl. Ex. 10 at 12, and makes no reference to any balloon payment, which is consistent with the testimony that only the monthly

26

payments were sold. A finding in ELGA's favor thus would permit it to collect at least the balloon payment of $240,000.

Defendants rely on *Equipment Leasing Group of America, LLC v. MCG Cane Bay, LLC*, No. 1-23-1143, 2024 WL 193998 (Ill. App. Ct. 1st Dist. Jan. 18, 2024), in support of the proposition that a party who assigns its rights under a contract loses standing to pursue a breach-of-contract claim against its counterparty. *See* Dkt. 249 at 7–8. In that case, an Illinois state trial court decided that ELGA lacked standing to raise claims for breach of a lease agreement after ELGA assigned its rights under that lease to a third-party bank. *ELGA*, 2024 WL 193998 at *2. The trial court reasoned that "ELGA was not entitled to damages for lost depreciation because ELGA is not a taxable entity and that any such damage would only be inflicted on its tax-paying member, . . . which was neither a party to Lease 1 [the lease ELGA did not assign] nor a third-party beneficiary." *Id.* Here, in contrast, ELGA did retain some rights under the AFA and Amended AFA, namely, the rights to receive the residual value of the collateral underlying the AFA and to collect the final balloon payment. This distinction is critical, because it means that ELGA in fact retains a concrete and particularized interest in this dispute that would be resolved by a decision in its favor.

Finally and additionally, even after ELGA assigned its rights to collect the monthly payments to CIBM, it remained obligated to service the loan on behalf of CIBM. The Master Lease Receivable Sales Agreement provides: "With respect to a Supplement, this Agreement shall not relieve the Seller [ELGA] from, or cause the Purchaser [CIBM] to be liable for, the obligations of the Seller under the Lease. All payments of Purchased Rents due after the date hereof are to be made by the Lessee directly to the Seller, who shall service such Leases on behalf of the Purchaser." Pl. Ex. 10 at 2. According to Rudy Trebels, this clause meant that ELGA was responsible "to service [the loan], collect payments, make collection calls, [and] hire attorneys." Tr. 344:20–

27

25. Because ELGA has the contractual obligation as CIBM's loan servicer, and because it has suffered redressable injuries in its own right as detailed above, it has Article III standing. *See Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 285 (2008) ("Lawsuits by assignees, including assignees for collection only, are 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'") (quoting *Vermont Agency of National Resources v. United States*, 529 U.S. 765, 777–78 (2000)).

## II.      Plaintiffs' Claims

### A.      Count I: Breach of AFA Against Pure Midstream

Plaintiffs' Count I is for breach of contract against Pure Midstream. "To succeed on an Illinois breach-of-contract claim, 'a plaintiff must plead and prove (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach.'" *In re Dealer Management Systems Antitrust Litigation*, 680 F. Supp. 3d 1011, 1020 (N.D. Ill. 2023) (quoting *Ivey v. Transunion Rental Screening Sols., Inc.*, 215 N.E.3d 871, 877 (Ill. 2022)); *see also Hernandez v. Illinois Institute of Technology*, 63 F.4th 661, 667 (7th Cir. 2023). The plaintiff must prove each element of its claim by a preponderance of the evidence. *Mannion v. Stallings & Co.*, 561 N.E.2d 1134, 1137–38 (Ill. App. Ct. 1st Dist. 1990).

Under Illinois law, "[t]he measure of damages for breach of contract is the amount that will compensate the aggrieved party for the loss which either fulfillment of the contract would have prevented or which the breach of it has entailed." *W. Bend Mutual Insurance Co. v. Procaccio Painting & Drywall Co.*, 794 F.3d 666, 679 (7th Cir. 2015) (internal quotation marks omitted). "A party injured by another's breach of a contract may seek recovery in the form of damages based on its expectation interest—obtaining the benefit of the bargain—or its reliance interest—

28

reimbursement for loss caused by reliance on a contract." *Lakeview Collection Inc. v. Bank of Am., N.A.*, 942 F. Supp. 2d 830, 857 (N.D. Ill. 2013).

The Court concludes that Plaintiffs established the elements that Pure Midstream breached the AFA, as amended by the Amended AFA. *First*, the parties had a valid, enforceable contract. "Under Illinois law, an offer, acceptance, and consideration form the basic ingredients of a contract." *Gaines v. Ciox Health, LLC*, 264 N.E.3d 1027, 1038–39 (Ill. App. Ct. 5th Dist. 2024) (citing *Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 109 (Ill. 2006), and *Arbogast v. Chicago Cubs Baseball Club, LLC*, 194 N.E.3d 534, 542–43 (Ill. App. Ct. 1st Dist. 2021)). "An enforceable contract must also include a meeting of the minds or mutual assent as to the terms of the contract." *Id.* (citing *Academy Chicago Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991)). "Whether parties have mutually assented to a contract is a question of fact." *Id.* (citing *Arbogast*, 194 N.E.2d at 542–43). "Mutual assent is determined by an objective standard." *Id.* (citing *Arbogast*, 194 N.E.3d at 542–43). Critically for this case, "[i]t is not necessary that the parties share the same subjective understanding as to the contract's terms, as it suffices if their conduct objectively indicates an agreement to the terms of the purported contract." *Id.* (citing *Academy Chicago Publishers*, 578 N.E.2d at 984). "Only overt acts and communications between the parties may be considered in determining whether and upon what terms they have entered into a contract." *Id.* (citing *Arbogast*, 194 N.E.3d at 542–43). "For a course of conduct to act as assent, it must be clear that the conduct relates to the specific contract in question." *Id.* (citing *Arbogast*, 194 N.E.3d at 542–43).

ELGA made an offer via its Confidential Equipment Finance Proposal (Pl. Ex. 42) to enter into an agreement to loan Pure Midstream between $2,500,000 and $2,700,000 to finance the Aircraft, in exchange for Pure Midstream making 72 monthly payments of $56,707 and one balloon payment of $270,000. Pl. Ex. 42 at 1. The Proposal includes a provision stating: "The Payments

29

shall be firm for the entire term of the Agreement, and Borrower's [Pure Midstream's] obligation to make Payments under the Agreement shall be absolute and unconditional." Pl. Ex. 42 at 3. DiMarco signed the Proposal as Pure Midstream's Managing Member, thereby accepting the offer on its behalf. Pl. Ex. 42 at 6; *see Bauer v. Qwest Communications Co., LLC*, 743 F.3d 221, 227 (7th Cir. 2014). DiMarco also signed on behalf of himself, Pure Aviation (MT), Pure Aviation (WY), and Pure Aviation AP as guarantors. Pl. Ex. 42 at 6–7.

After Pure Midstream accepted that offer, ELGA underwrote the transaction, brought it to its credit committee, and approved the agreement. Tr. 33:20–34:4, 35:17–24. The AFA has the same critical terms, namely, that ELGA would provide DiMarco with roughly $2,400,000 in financing and hold back $300,000, which would be disbursed if Pure Midstream could grant ELGA a first priority security interest in certain other collateral; that Pure Midstream in exchange would pay ELGA 72 monthly payments of $56,707 and one final monthly payment of $270,000 (the balloon payment); and that Pure Midstream "may prepay the Indebtedness," but its "obligation to pay all installment payments and all other amounts payable under this Agreement is absolute and unconditional." Pl. Ex. 1 at 1–2, 18. The AFA was signed by both parties, with DiMarco signing on behalf of Pure Midstream as the borrower and himself, Pure Aviation (MT), Pure Aviation (WY), and Pure Aviation AP as guarantors. Pl. Ex. 1 at 15, 45–52. This constitutes a valid, enforceable contract. Indeed, Pure Midstream's own counsel opined as much. Pl. Ex. 58 at 5 (letter from Pure Midstream's counsel concluding that "[t]he [AFA] constitutes the legal, valid, and binding obligations of Borrower [Pure Midstream], enforceable in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other laws affecting creditors' rights generally and by principles of equity and judicial discretion").

30

Several months later, DiMarco determined he could not or would not grant ELGA a first priority security interest in certain other of Pure Midstream's collateral. Tr. 166:7–10, 388:2–5. The AFA, as originally drafted, contemplated that if Pure Midstream did not grant ELGA a first priority security interest by April 30, 2023, Pure Midstream would automatically forfeit the additional $300,000 being held by ELGA, and in turn its monthly payments would reduce to $50,346 and its final balloon payment would reduce to $240,000. Pl. Ex. 1 at 28–29. Although this was set to occur automatically by April 30, 2023, DiMarco requested that the payment schedule change sooner so as to reduce his monthly payments. Tr. 388:2–5. ELGA and Pure Midstream thus sought to amend the AFA to reflect that the additional $300,000 in funding would drop out of the transaction and Pure Midstream would have lower monthly payments. Tr. 388:2–5; Pl. Ex. 63 at 1. The parties mutually executed the Amended AFA, which sets forth an amended payment schedule of two payments of $56,707 (which at that point had already been paid); seventy payments of $50,309; and one payment of $240,000.00. Pl. Ex. 2 at 1. The Amended AFA otherwise provides that Pure Midstream "agrees and reaffirms all terms, conditions, duties, and obligations due under the AFA, as amended." Pl. Ex. 2 at 1. This, too, constitutes a valid, enforceable contract, as it reflects an offer, acceptance, and consideration. Tr. 47:18–48:8.

Defendants argue that there was no meeting of the minds, and thus no contract to be breached, because "the parties never reached a common understanding regarding essential terms and conditions of the Amended AFA." Dkt. 252 at 2–3. They contend that DiMarco "understood that Pure Midstream could pay that loan back before the end of the loan's term by paying the principal and accrued interest as of the payoff date," did not "understand at the time he signed the AFA that Pure Midstream would be required to pay unaccrued interest through the entire life of the loan," and did not "understand[] that he would be required to pay $3.8 million to pay off a $2.4

31

million loan if he tried to pay it off after a mere seven months." Dkt. 252 at 3. They point to: (1) the amortization tables ELGA provided during the discussions leading up to the execution of the Amended AFA, (2) ELGA employees' statements that the amortization table would become "valid" or "effective" upon DiMarco's signature of the Amended AFA, and (3) the fact that Di-Marco immediately expressed surprise when confronted with the payoff amount and its apparent inconsistency with his understanding of the amortization tables.

The first flaw in Defendants' argument is that "[t]he subjective understanding of the parties is not required in order for there to be a meeting of the minds." *Urban Sites of Chicago, LLC v. Crown Castle USA*, 979 N.E.2d 480, 496 (Ill. App. Ct. 1st Dist. 2012); *see also Gaines*, 264 N.E.3d at 1038–39. "To determine whether a party assented, the court 'look[s] first to the written records, not to mental processes.'" *Bauer v. Qwest Communications Co., LLC*, 743 F.3d 221, 227 (7th Cir. 2014) (quoting *Newkirk v. Village of Steger*, 536 F.3d 771, 774 (7th Cir. 2008)). Here, the signed, written records—the AFA and the Amended AFA—establish that Pure Midstream agreed to an "absolute and unconditional" obligation "to pay all installment payments and all other amounts payable under this Agreement." Pl. Ex. 1 at 1. In the AFA, these payments were defined as 72 payments of $56,707 and one payment of $270,000. Pl. Ex. 1 at 1. In the Amended AFA, these payments were redefined as two payments of $56,707; 70 payments of $50,309; and one payment of $240,000. Pl. Ex. 2 at 1. Pure Midstream otherwise "agree[d] and reaffirm[ed] all terms, condi-tions, duties, and obligations due under the AFA, as amended, and the Addendum, as amended, and has no setoff or defenses of any kind or nature against Lender arising out of or related in any way to the AFA or the Addendum." Pl. Ex. 2 at 1. The "absolute and unconditional" term was unaltered by the Amended AFA, and that term requires payment of the entire balance of payments, regardless of when the payoff is made.

The second flaw in Defendants' argument is that it relies on parol or extrinsic evidence. "Traditional contract interpretation principles in Illinois require that[] '[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.'" *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) (quoting *Western Illinois Oil Co. v. Thompson*, 186 N.E.2d 285, 291 (Ill. 1962)). "If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Id.* (citing *Farm Credit Bank v. Whitlock,* 581 N.E.2d 664, 667 (Ill. 1991)). "If, however, the trial court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity is present," and "[o]nly then may parol evidence be admitted to aid the trier of fact in resolving the ambiguity." *Id.* at 462–63 (citing *Whitlock*, 581 N.E.2d at 667).

The AFA, as amended by the Amended AFA, is unambiguous on its face: it requires 72 monthly payments followed by one balloon payment of $240,000. It says in the first sentence of Paragraph 1.2 that Pure Midstream "may prepay the Indebtedness," which may on its own suggest that some sort of discounted prepayment may be allowed. Pl. Ex. 1 at 2. But the very next sentence of Paragraph 1.2 makes clear that even if prepaying, Pure Midstream's "obligation to pay all installment payments and all other amounts payable under this Agreement is **absolute and unconditional under any and all circumstances** and shall not be affected by any circumstances of any character." Pl. Ex. 1 at 2 (emphasis added). DiMarco may have had a different subjective belief, but "[a] contract is not ambiguous merely because the parties disagree on a particular provision's meaning." *Lease Management Equipment Corp. v. DFO Partnership*, 910 N.E.2d 709, 716 (Ill.

33

App. Ct. 1st Dist. 2009). As neither the AFA nor the Amended AFA include any amortization table, the Court may not consider that evidence.

But even if the contracts were ambiguous, and this Court were to consider extrinsic evidence, it still would not change the Court's conclusions. On March 10, 2023, when the parties first communicated in writing about the Amended AFA, ELGA sent no amortization table, suggesting at the outset that it did not view the table as part of any Amended AFA. *See* Pl. Ex. 63. Then, on March 21, 2023, ELGA sent an amortization table *at DiMarco's request*. Def. Ex. 26 at 1–2; Tr. 50:2–5, 56:1–5. On March 24, 2023, ELGA sent DiMarco a revised amortization schedule—again at DiMarco's request—and explicitly stated that "the amortization schedule is provided as a courtesy and ELGA makes no representations that such amortization schedule meets generally accepted accounting principles. The attached amortization schedule is also not intended to be used for payoff purposes." Pl. Ex. 18 at 1; Tr. 172:5–173:15. ELGA sent another revised amortization schedule on March 27, 2023, with the similar caveat that the table "is provided as a courtesy and ELGA makes no representations that such amortization schedule meets generally accepted accounting principles. The attached amortization schedule is also not intended to be used for payoff or buy out purposes." Pl. Ex. 13 at 1; Tr. 173:20–175:4. DiMarco returned the signed Amended AFA to ELGA on or about March 29, 2023. Tr. 176:3–5. He did not appear to have followed up with ELGA to discuss how an early payoff would work or be calculated, the effect of the amortization table on the Amended AFA (if any), or ELGA's disclaimers about the amortization table. Tr. 175:13–176:2. His unilateral requests for the table do not show any intent by ELGA to include the table in the Amended AFA or to give DiMarco an option to pay off the loan early based upon the amortization table. Indeed, ELGA representatives (whom the Court found credible) expressly

34

testified they would not have made the deal if it allowed for early prepayment that did not include the balance of all gross payments. Tr. 144:13–19.

That ELGA employees informed DiMarco that the amortization table would be "valid" or "effective" upon his signature also does not change the Court's conclusions. Def. Ex. 26 at 2; Pl. Ex. 13 at 1. Although those words might suggest in isolation that the tables had legal effect upon DiMarco's signature, in context they do not overcome the manifest weight of the objective evidence showing that the tables were not part of the Amended AFA—namely, (1) that neither the AFA nor the Amended AFA refer to or include as attachments any amortization tables; (2) that there are no extrinsic writings expressing the parties' mutual agreement that the tables were part of the AFA or Amended AFA; (3) that DiMarco, not ELGA, was the one who requested the tables in the first instance; and (4) that ELGA repeatedly warned DiMarco not to rely on the tables for accounting purposes or to calculate early payoffs or buyouts. Moreover, the Court finds Laura Kerton's explanation on this point credible. When cross-examined about her use of the word "effective" in her emails to DiMarco (Pl. Ex. 13), she explained: "To be honest I think, 'The attached amortization schedule becomes effective' really it's a poor way of me saying that the reduced payments didn't become effective until he signed the amendment." Tr. 214:8–11. In other words, she was not representing or intending that the table would be incorporated into the Amended AFA and become effective as part of it upon DiMarco's signature, nor that ELGA was committing to apply DiMarco's payments in a certain way, but merely explaining that the reduction in payments—which at that point in time was still being discussed and calculated—would only become effective upon DiMarco's signature. The Court credits this testimony as a reasonable explanation for this language.

Moreover, if the Court were considering extrinsic evidence, the Court's conclusion is

further supported by the testimony of Plaintiffs' expert witness, Bob Rinaldi. Rinaldi testified that in the equipment leasing and financing industry, the term "absolute and unconditional" means, "essentially, your payments must be made no matter what." Tr. 243:22–244:2. He also testified that such provisions are "customary" in the industry. Tr. 250:4–11. His opinion underscores the Court's conclusion that the AFA requires that all of the payments be made, even if they can be made early.[12]

After considering DiMarco's testimony and reviewing his communications with ELGA after he requested a payoff letter, DiMarco may have had the subjective belief or mistake that the loan could be paid off early at less than the amount provided for in the AFA and, later, the Amended AFA. But for all the reasons discussed, that was his mistake, and "'[t]he unilateral mistake of one party to a contract may not be relied upon to relieve that party from the obligations of the contract where the party's own negligence and lack of prudence resulted in the mistake.'" *Urban Sites of Chicago, LLC*, 979 N.E.2d at 493–94. "A party to an agreement is charged with knowledge of and assent to the agreement signed." *Id.* (quoting *Melena v. Anheuser–Busch, Inc.*, 847 N.E.2d 99, 108 (Ill. 2006)). "It follows that, in the absence of fraud, where a person could have read a contract and ascertained the accuracy of the documents, but neglected to do so, he may

---

[12] As noted above, the Court qualified Rinaldi as an expert and admitted his testimony under Federal Rule of Evidence 702. Tr. 239:22–240:1. Defendants objected to Rinaldi's testimony on relevance grounds, which the Court took under advisement. *See* Tr. 239:22–240:17. The Court now OVERRULES that objection. The Court does not rely on Rinaldi's testimony to the extent he offers any opinion about what the AFA says or how it should be construed. But the Court may, to the extent that it reaches parol evidence, consider Rinaldi's opinion that "absolute and unconditional" clauses are, in fact, customary in the equipment leasing and financing industry, and his opinion about how such terms are commonly understood. *See Klaczak v. Consolidated Medical Transport*, 458 F. Supp. 2d 622, 636–37 (N.D. Ill. 2006) (recognizing that an expert is not permitted "to offer his opinion on how, as a matter of law, [a] contract should be construed," but expert testimony "may be allowed when it addresses on [*sic*] custom and practice in a particular trade, as it relates to a contract dispute").

not avoid the legal consequences of the executed contract on the ground that the signing was done without knowledge of its contents." *Id*. The "absolute and unconditional" term about all payments was included in both the Confidential Equipment Finance Proposal (Pl. Ex. 42) and the AFA, and thus, DiMarco had a full and fair opportunity to fully read and ascertain the meaning of this provision, and indeed was even represented by counsel in connection with the execution of the AFA. Tr. 373:15–16; *see* Pl. Ex. 58.

For all of these reasons, the Court concludes that the AFA, as amended by the Amended AFA, constitutes a valid, enforceable contract.

*Second*, ELGA substantially performed under the AFA, as amended by the Amended AFA. "Under the doctrine of substantial performance, a party must demonstrate 'all the essential elements necessary to the accomplishment of the purpose of the contract.'" *Wells Fargo Bank, N.A. v. Smith & Co., Inc.*, No. 22-cv-00474, 2023 WL 4352106, at *3–4 (N.D. Ill. July 5, 2023) (quoting *Reserve Hotels PTY Ltd. v. Mavrakis*, 790 F.3d 738, 741 (7th Cir. 2015)). ELGA accomplished the purpose of the contract when it disbursed $2,400,000 in funds to Pure Midstream, which in turn allowed Pure Midstream to finance the Aircraft. Pl. Ex. 1 at 18.

Defendants argue that ELGA did not substantially perform, and instead breached the AFA and Amended AFA, when it purportedly failed to apply Pure Midstream's payments to pay down the principal on the loan under the amortization table. *See* Dkt. 252 at 8–9. But as explained above, the amortization table was not part of the contract, so ELGA had no obligation to apply Pure Midstream's payments in this particular manner.

*Third*, Pure Midstream breached the AFA, as amended by the Amended AFA. The AFA lists various events that constitute an "Event of Default," including when: Pure Midstream fails to pay any installment payment or other amount within 10 days of its due date; Pure Midstream fails

37

to perform its obligations in Sections 3, 8, 9 or 18 of the AFA (relating to Pure Midstream's maintenance, use, and operation of the Aircraft; its retention of the Aircraft as personal property; its provision of financial reports to ELGA; and its cooperation in effectuating any assignment by ELGA); any Guarantor becomes insolvent or bankrupt or applies for bankruptcy; or any Guarantor defaults in its obligations with respect to any guarantee. Pl. Ex. 1 at 8.

Plaintiffs allege several defaults by Defendants, including failing to make timely payments, failing to properly maintain the Aircraft, failing to adhere to FAA required maintenance schedules, failing to maintain a maintenance program with Pratt & Whitney Canada, moving the hangar location of the Aircraft without prior notice, failing to provide financial statements, allowing a lien to be placed on the Aircraft, and Guarantor Pure Aviation (WY)'s filing for bankruptcy in March 2025. Dkt. 56 at 8–9; Dkt. 253 at 8–9. It is undisputed, however, that Pure Midstream and Guarantors have not made any installment payments on the loan since January 2024. *See* Dkt. 253 at 11–12. That is a clear breach of the AFA and Amended AFA. The Court accordingly need not address Plaintiffs' other theories or allegations of default.

Defendants argue in response that ELGA breached the AFA first by misapplying Pure Midstream's payments under the amortization table, so Pure Midstream's later breach is excused under the first-to-breach rule. *See* Dkt. 252 at 8–9 (citing *PML Development LLC v. Village of Hawthorn Woods*, 226 N.E.3d 1163, 1175 (Ill. 2023)). That rule says that "a party's duty to perform under the contract" is excused "if the other party materially breaches the agreement first." *PML Development LLC*, 226 N.E.3d at 1175. However, as discussed above, ELGA was under no

obligation to apply Pure Midstream's payments in the way that Defendants advance, so it did not breach the contract. Thus, *PML Development* and the first-to-breach rule do not apply.[13]

*Fourth*, Plaintiffs suffered damages, specifically, the lost revenue from Pure Midstream's failure to make payments. Under the AFA, ELGA is entitled to seek "all payments, late charges, collection costs, attorney fees) (collectively, the 'Indebtedness')." Pl. Ex. 1 at 2; *see also* Pl. Ex. 1 at 9 ("Borrower shall pay all reasonable costs, expenses and damages incurred by Lender because of the Event of Default or its actions under this section, including, without limitation any collection agency and/or attorney fees and expenses, and any costs related to the repossession, safekeeping, storage, repair, reconditioning or disposition of the Collateral").

Accordingly, the Court finds for Plaintiffs on Count I on the breach of contract claim.

### B. Counts II–V: Enforcement of Guaranties Against DiMarco, Pure Aviation (WY), Pure Aviation (MT), and Pure Aviation AP

Plaintiffs' Counts II–V are for breach of guaranty against DiMarco, Pure Aviation (WY), Pure Aviation (MT), and Pure Aviation AP, respectively. On a breach-of-guaranty claim, "the court considers: (1) whether a contract existed; (2) whether the contract was breached; and (3) whether the guaranty also was breached." *Bank of Montreal v. SK Foods, LLC*, No. 09-cv-03479, 2010 WL 3385534, at *2 (N.D. Ill. Aug. 19, 2010). "Under Illinois law, a suit on a guarantee requires that the plaintiff 'enter[] proof of the original indebtedness, the debtor's default and the guarantee.'" *Id*. "Where, as here, the guaranty was executed at the same time as the original obligation, no separate consideration for the guaranty is required." *Id.* (citing *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 864 N.E.2d 927, 937 (Ill. App. Ct. 1st Dist. 2007)); *see also* Restatement (Third) of Suretyship and Guaranty § 9, Comment a, at 35 (1996) ("Typically, the

---

[13] Defendants also cannot rely on a theory of anticipatory repudiation, since the Court already dismissed that Counterclaim. *See* Dkt. 234.

39

consideration supporting the underlying obligation will also support the secondary obligation and no separate consideration is necessary.").

As discussed above, a valid contract existed between ELGA and Pure Midstream, and Pure Midstream breached that contract. ELGA has produced evidence of the original indebtedness (the valid, enforceable AFA and Amended AFA), and Pure Midstream's default (the failure to make payments on the loan). Plaintiffs also proved the existence of the guarantees at issue. Pl. Ex. 1 at 45–52. There has been no evidence produced that any Guarantor has made subsequent payments on the loan.

Accordingly, the Court finds for Plaintiffs on Counts II, III, IV, and V.

### C.     Count VI: Writ of Replevin Against Pure Midstream

Plaintiffs' Count VI seeks a writ of replevin against Pure Midstream to take immediate possession of the Aircraft. Under Illinois law, a party may bring a replevin action for the recovery of goods or chattels that have been wrongfully detained. 735 ILCS 5/19-101. In this case, however, the AFA provides that repossession of the Aircraft is one of Plaintiffs' remedies in the event of default, which this Court has now found. *See* Pl. Ex. 1 at 8. For that reason, the Court denies Count VI as moot.

### D.     Count VII: Claim for Injunctive Relief Against All Defendants

Plaintiffs' Count VII seeks injunctive relief permitting them to repossess the Aircraft, as permitted under the AFA. In a contract dispute, injunctive relief "is not available as a matter of course; it remains a creature of equity, and so the district court has discretion to decide whether that relief is warranted, even if it has found liability. The party seeking an injunction must demonstrate (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

40

public interest would not be disserved by a permanent injunction. The party seeking an injunction bears the burden of persuasion: 'damages are the norm, so the plaintiff must show why his case is abnormal.'" *In re Dealer Management Systems Antitrust Litig.*, 680 F. Supp. 3d at 1022 (citations omitted).

In this case, however, an injunction would be irrelevant and/or unnecessary at this stage; the AFA provides that repossession of the Aircraft is one of Plaintiffs' remedies in the event of default, which this Court has now found. *See* Pl. Ex. 1 at 8. For that reason, the Court denies Count VII as moot.

### E. Count VIII: Confession of Judgment Against Pure Midstream

Plaintiffs' Count VIII seeks a confession of judgment against Pure Midstream. A confessed judgment is an "ancient legal device by which the debtor consents in advance to the holder's obtaining a judgment without notice or hearing, and possibly even with the appearance, on the debtor's behalf, of an attorney designated by the holder." *D. H. Overmyer Co. Inc., of Ohio v. Frick Co.*, 405 U.S. 174, 176 (1972). The AFA includes a confession-of-judgment provision. *See* Pl. Ex. 1 at 10. But Plaintiffs have litigated this case through trial, and thus appear not to have used that procedure. Accordingly, the Court denies Count VIII as moot.

## III. Defendants' Counterclaims

Defendants initially raised nine counterclaims against Plaintiffs. *See* Dkt. 195 at 4–11. The Court previously dismissed Counterclaims I and IX. *See* Dkt. 234. The Court addresses now Counterclaims II–VIII.

### A. Counterclaim II: Declaratory Relief Regarding Prepayment and Amount Owed

Defendants seek a declaratory judgment: (1) stating that Pure Midstream is not obligated to pay a "prepayment penalty" under the AFA, and (2) calculating the correct amount Pure

Midstream owes. Dkt. 195 at 4–5. The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201.

Defendants ask the Court to enter a declaratory judgment essentially adopting their construction of the AFA. But their reading of the AFA is foreclosed by the Court's conclusions above, including: the AFA requires full payment of all monthly and balloon payments even if prepaid before the end of the term; and making all of the payments is absolute and unconditional. *See* Pl. Ex. 1 at 1. This is clear from the face of the AFA, but even if the AFA were ambiguous, it is supported by extrinsic evidence (including the testimony of expert Bob Rinaldi), as explained above. Accordingly, the Court finds for Plaintiffs on Counterclaim II.

### B. Counterclaim III: Declaratory Relief Regarding Payment of Interest and Amount Owed

Defendants seek a declaratory judgment stating that Pure Midstream only owes Plaintiffs their past due payments, late charges, and the remaining principal balance due, and that Plaintiffs are not entitled to collect "the interest over the life of the loan." Dkt. 195 at 5–6.

As explained above, Defendants are obligated to pay all of the payments listed in the AFA, as amended by the Amended AFA. Accordingly, the Court finds for Plaintiffs on Counterclaim III.

### C. Counterclaim IV: Declaratory Relief Regarding Breach of AFA's Maintenance Requirements

Defendants seek a declaratory judgment stating that Pure Midstream has not breached the AFA's maintenance requirements. Dkt. 195 at 6. However, as discussed above, Defendants

42

undisputedly breached the AFA when they ceased making payments, and thus the Court does not reach the maintenance issue. Accordingly, the Court denies Counterclaim IV as moot.

### D. Counterclaim V: Reformation

Defendants seek to reform the AFA and Amended AFA to include the amortization table that ELGA provided during the discussions of the Amended AFA. Dkt. 195 at 6–7. "The underlying basis for a reformation action is the existence of a mutual understanding between the parties which the parties agreed to reduce to writing, but in doing so, either through mutual mistake or mistake on one side coupled with fraud on the other, omitted some material provision." *Briarcliffe Lakeside Townhouse Owners Association v. City of Wheaton*, 524 N.E.2d 230, 235 (Ill. App. Ct. 2d Dist. 1988). "The action for reformation is to change the written instrument by inserting the omitted provision so that the instrument conforms to the original agreement between the parties." *Id.* "Thus, what is sought to be reformed *is not the understanding between the parties,* but rather the *written instrument* which inaccurately reflects it." *Id.* "Before a court may reform a contract on the grounds of mutual mistake, the party seeking reformation must prove by clear and convincing evidence that (1) there was an agreement between the parties; (2) the parties agreed to put their agreement into writing; and (3) a variance exists between the parties' original agreement and the writing." *Id.*

As explained above, there was no mutual agreement to include any amortization table as part of the Amended AFA; at most DiMarco was unilaterally mistaken that the amortization table would be included. And even if DiMarco was unilaterally mistaken in his belief that the amortization table was part of the contract, there was no fraud on the other side, as discussed below. So there is no basis for reformation. The Court finds for Plaintiffs on Defendants' Counterclaim V.

### E.    Counterclaim VI: Declaratory Judgment Regarding Usurious Interest

Defendants seek a declaratory judgment stating they are not required to pay interest on the loan in excess of the rate set by Illinois usury laws. Dkt. 195 at 7.

The AFA includes a provision stating:

> Regardless of any provision in this Agreement, or any document in connection therewith, Lender shall not be entitled to receive, collect or apply, as interest on any Obligation, any amount in excess of the Maximum Amount (the 'Excess'). As used herein, 'Maximum Amount' shall mean the maximum amount of interest which would have accrued if the unpaid principal amount of the Obligation outstanding from time to time had borne interest each day at the maximum amount of interest which lender is permitted to charge on the Obligation under the Usury Laws.

Pl. Ex. 1 at 12. Defendants argue that even though Illinois' usury laws do not apply to commercial transactions by their own force, the parties here expressly agreed through the provision above that the statutory rate would apply to their loan, so ELGA cannot charge an effective interest rate greater than 5% (or certainly not greater than 9%, as capped by the statute). Dkt. 252 at 14–15 (citing 815 ILCS 205/2, 205/4).

Defendants did not identify any relevant case law on the usury issue. *See* Dkt. 252 at 13–15. And for several reasons, the Court is not persuaded by Defendants' argument. First, there is no evidence that ELGA was charging a particular interest rate on the loan at all. The AFA is structured so that ELGA provides funds to Pure Midstream, and Pure Midstream in turn makes a fixed number of monthly payments at a set amount. *See* Pl. Ex. 1 at 1. Neither the AFA nor the Amended AFA cites any particular interest rate on the amounts financed. *See* Pl. Ex. 1 at 1–15; Pl. Ex. 2 at 1. It is possible to calculate an imputed interest rate from those figures, but Defendants did not present any evidence that the parties actually negotiated over and contracted for a specific interest rate on the loan. And, no one testified to having negotiated a specific interest rate on the loan. *See* Tr. 135:1–3 (Brian Trebels: "Q. There's not an interest rate identified in the AFA; is that correct? A. No, not that I'm aware of.").

44

Alternatively, the Court disagrees that any interest rate (imputed or actual) is limited by the plain language of the AFA. The AFA defines "Maximum Amount" as the interest that would accrue if the principal carried the "maximum amount of interest *which lender is permitted to charge* on the Obligation *under the Usury Laws*." Pl. Ex. 1 at 12 (emphasis added). Illinois law provides: "[I]n all written contracts it shall be lawful for the parties to stipulate or agree that an annual percentage rate of 9%, or any less sum, shall be taken and paid upon every $100 of money loaned or in any manner due and owing from any person to any other person or corporation in this state, and after that rate for a greater or less sum, or for a longer or shorter time, except as herein provided." 815 ILCS 205/4(1). The same section then includes the following exception: "It is lawful to charge, contract for, and receive any rate or amount of interest or compensation . . . with respect to . . . [a]ny loan *made to a corporation*." 815 ILCS 205/4(1)(a) (emphasis added). So how much interest is ELGA permitted to charge for loaning money to a corporation like Pure Midstream? "[A]ny rate or amount of interest or compensation." *Id.* The Court disagrees with Defendants that this results in a "windfall," since it is exactly what Pure Midstream contracted for and for which the relevant statute provides. The Court finds for Plaintiffs on Counterclaim VI.

### F.    Counterclaim VII: Fraud in the Inducement

Defendants bring a counterclaim for fraud in the inducement. Dkt. 195 at 7–9. "In Illinois, fraudulent inducement requires proof of five elements: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003) (internal quotation marks omitted). The party asserting fraud has the burden to prove each element by clear and convincing evidence. *Id.*

Defendants hinge their argument on two statements made by ELGA employees while discussing the Amended AFA: (1) "[T]his amortization schedule will only be valid ***upon receipt of the signed and completed amendment*** . . . ." Def. Ex. 26; and (2) "The attached amortization schedule becomes effective ***upon your return of the executed Amendment*** to Aircraft Financing Agreement [*sic*]." Pl. Ex. 13 (emphases added). Defendants' argument fails at the first and second elements, however. As explained above, the Court finds that these statements were not false. As Laura Kerton testified, they were imprecise. It was true that *the lower payments* identified in the amortization tables would become "valid" and "effective" when DiMarco signed the documents.

Additionally, in light of ELGA representatives' repeated warnings to DiMarco not to rely on the amortization tables for payoff purposes, the Court does not find that the amortization tables themselves were intended to induce DiMarco to act. *See Hoseman*, 322 F.3d at 476.

Thus, the Court finds for Plaintiffs on Counterclaim VII.

### G.  Counterclaim VIII: Breach of Contract Based on Implied Duty of Good Faith and Fair Dealing

Defendants bring a final counterclaim for breach of contract based on violations of the implied duty of good faith and fair dealing. Dkt. 195 at 9–10. Under Illinois law, "[t]he duty of good faith and fair dealing is implied in every contract." *LaSalle Bank N.A. v. Paramont Properties*, 588 F. Supp. 2d 840, 857 (N.D. Ill. 2008). It is a breach of the duty of good faith and fair dealing when a party uses their discretion under a contract "in bad faith, unreasonably, or in a manner inconsistent with the reasonable expectations of the parties." *Id.* "Illinois courts use the covenant [of good faith and fair dealing] to determine the intent of the parties where a contract is susceptible to two conflicting constructions." *Id.* at 858.

Defendants argue that ELGA was vested with discretion "in determining the calculation of loan payments," and that ELGA violated its duty of good faith and fair dealing by "seeking to

recover over $3.8 million from Pure Midstream in a period of seven months on a $2.4 million loan." Dkt. 252 at 11. But Defendants can point to no evidence showing that ELGA had such discretion. (Even under Defendants' own theory, ELGA was obligated to apply the payments according to the amortization table—meaning, it had no discretion.) As discussed above, the amortization table was not part of the Amended AFA, so ELGA's only "obligation" was merely to receive Pure Midstream's payments, not to apply them in any specific manner. And seeking to recover an amount above the original $2.4 million loan does not violate any implied duty when it is precisely what the parties contracted for, as explained above. The Court finds for Plaintiffs on Counterclaim VIII.

## DAMAGES AND REMEDIES

The AFA provides ELGA with numerous remedies in the event of a default, including (but not necessarily limited to): requiring Pure Midstream to turn over the collateral (the Aircraft); repossessing the collateral; selling the collateral; requiring Pure Midstream to pay all unpaid installments, late charges, and any other amounts due under the AFA, plus interest; and requiring Pure Midstream to pay its "reasonable costs, expenses and damages . . . including . . . attorney fees and expenses, and any costs related to the repossession, safekeeping, storage, repair, reconditioning or disposition of the Collateral." Pl. Ex. 1 at 8–9.

Having found in favor of the Plaintiffs as discussed above, the Court concludes that Plaintiffs are entitled to these remedies and damages pursuant to the AFA. The parties are to follow the procedure laid out in the introduction of this decision to proceed into findings on remedies and the amount of damages.

SO ENTERED AND ORDERED.

DATED: May 1, 2026

HON. BETH W. JANTZ
United States Magistrate Judge